Cummings Sand and Gravel Company, Appellant, v. Minneapolis & St. Louis Railway Company, Appellee.

CARRIERS: Control and Regulation—"Switching" and "Transportation" Service Contrasted. The transportation of property by a railway company from a definite initial point to a definite terminal point, even though both points are within the same city, is not deprived of the characteristic of a *"line"* haul because of the fact that *incidental* switching is necessarily employed by the initial carrier at the point of receipt, and at a junction point with a connecting carrier, and by the delivering carrier at the point of delivery. (Sec. 2125, Code Suppl. Supp., 1915.)

CARRIERS: Control and Regulation—Tariff Rates—Action to Recover—Discrimination—Effect. An action by a carrier to collect its published tariff rate in full may not be defeated by a showing that the carrier has charged other shippers a lower rate. The remedy for such wrong is enforcement of the penal provisions of the Antidiscrimination Act. (Sec. 2125, Code Suppl. Supp., 1915; Sec. 2128 *et seq.*, Code, 1897.)

*Appeal from Cerro Gordo District Court.*—M. F. Edwards, Judge.

FEBRUARY 13, 1918.

ACTION in equity for a mandatory injunction requiring defendant to accept in payment for services rendered in handling freight for the plaintiff, a sum less than the published tariff rate for long distance haul, on the theory that the services were in the nature of switching service; or if not, that defendant had so construed the service, in that it hauled for others in a like situation and charged for so doing as for a switching service.—*Affirmed.*

*Senneff, Bliss & Witwer,* for appellant.

*C. H. E. Boardman, W. H. Bremner,* and *F. M. Miner,* for appellee.

1. CARRIERS:
control and
regulation:
"switching"
and "trans-
portation"
service con-
trasted.

GAYNOR, J.—The defendant is a railroad company, operating a line of road north and south through Mason City. East of defendant's line, and nearly parallel, runs a line of road owned and operated by the Chicago, Milwaukee & St. Paul Railway Company, hereafter called the Milwaukee. On the line of the last named company, and connected with it by a spur track, plaintiff owned and is operating a gravel pit. The junction of the Milwaukee and the defendant company's line is at a point approximately two miles south of plaintiff's gravel pit.

Prior to the time this complaint was lodged, plaintiff had ordered cars from the defendant company to be sent down its line to the junction, and up the Milwaukee line to the plaintiff's spur track. These cars, as we understand the record, were taken by the Milwaukee Company's switching crew to the gravel pit, and there loaded with sand, and when loaded, carried by it to its junction with the defendant road, and there switched onto defendant's road. The defendant's switching crew there received and carried the loaded cars to its depot. The tracks of both these companies and the junction are in Mason City. The gravel pit is slightly to the east of the city limits. For some time prior to the commencement of this action, cars loaded with sand had been carried from this gravel pit south to the junction by the Milwaukee, and then north by defendant company to its depot, and there delivered to the plaintiff on what is known in this record as the Quimby Track. After a number of cars had been delivered, defendant refused to receive and transport more, unless the plaintiff would pay to the defendant company for the cars already delivered, and for the other cars tendered, a freight rate of $8 per car, and $4 additional switching charges. This the plaintiff refused to pay, claiming that the service rendered is a switching service, and claiming that defendant had served other in-

dustries along this line, under approximately similar circumstances, as for switching service, at the rate of $4 a car—$2 for the Milwaukee and $2 for itself.

This action is brought to compel the defendant to receive and transport the cars tendered at the rate of $4 a car, and to compel the defendant to accept payment for cars delivered at the same rate.

It is the claim of plaintiff that the services demanded and rendered are within the switching district, and, therefore, defendant is entitled to charge and receive payment only as for switching service, to wit, $4 per car. It is conceded that, if it is a line haul, the amount demanded by the defendant is the published tariff rate. It is not claimed that the $4 is not a proper switching charge.

The claim of the defendant is that the services rendered were a transportation, or line, haul, and not a switching service, and that it cannot legally charge or receive less than the tariff rate for a line haul.

We herewith submit a draft, showing the relative location of the lines and roads and junction, and the several industries, with their spur tracks, as the same appear in the record.

It appears from the record that the plaintiff is operating a sand pit east of the Milwaukee lines and outside the city limits; that this industry is connected by a spur track with the Milwaukee road; that the plaintiff ordered these cars from the defendant company, and upon such order, they were shipped by defendant company to this junction with the Milwaukee, and there taken by the Milwaukee and carried to its sand and gravel pit, and there

loaded. Thereupon, the Milwaukee Company transferred the cars back to the junction, switched them onto defendant company's road at the junction, and they were there received by the switching crew of the defendant company, and transported to and placed upon what is known as the Quimby Spur Track, shown upon the plat. After they were loaded at defendant's gravel pit, they were carried by the Milwaukee main line to the junction, and there switched on defendant's line. Thereupon, defendant's switching crew took the cars, and hauled them north upon its main line until it reached the Quimby Spur, and there switched them on the Quimby Spur.

It appears that the plaintiff had a contract to erect a bridge, just north of this Quimby Spur, over a creek, and this sand and gravel were shipped for the purpose of completing that contract. The gravel was shipped over these two roads from the gravel pit to the Quimby Spur, or to the point where it was switched to the Quimby Spur for the use of the plaintiff. It was received by the Milwaukee Company at a definite point on its road, and by both companies, each in its turn, carried to a definite point on defendant's road. The only switching that seems to have been done was shunting the cars from the spur track that led to the gravel pit onto the Milwaukee main line, and then further switching at the junction from the Milwaukee main line to the defendant's main line. They were there transported on defendant's main line from the junction to the point opposite the Quimby Spur, and there shunted onto the Quimby Spur for the use of the plaintiff. The services rendered by these companies, for which the charges were made, were the services from a definite initial point to a definite terminal point.

It is apparent that the only service rendered for which the charge is made, is a service in transporting the gravel from the gravel pit, over the Milwaukee and defendant's roads, to the Quimby track. No services were rendered by

either company other than are involved in the act of transferring this sand from one definite point to another. A line haul has been defined to be the transportation of property from an initial point to a terminal point. In the line haul, switching may be, and sometimes is, an incident. It is an incident to the line haul. Switching is a part of the transportation. It is incident to the transportation. It either precedes the initial shipment in the transferring of goods to a point for shipment, or it follows a shipment, and is a transferring of goods from the terminal point of the shipment to the place of actual delivery, on spurs or switch tracks. Here, the services rendered constituted the carrying of goods from the initial point at which they were received to the point of delivery. The carriage was over both roads. The services charged are for the services of both roads. The switching at the junction was an incident to the transportation, and we think it is immaterial whether this was done by a switching crew or otherwise. It is the character of the service that determines whether it be a line haul or a switching service. Switching, or transfer, service is one which precedes or follows a transportation service, and applies only to a shipment on which legal freight charges have already been earned, or are to be earned. See *Dixon v. Central of Georgia R. Co.*, 110 Ga. 173 (35 S. E. 369).

When goods are received at a definite point on one road for shipment to a definite point on another road, switching may precede, as an incident to the preparation of the shipment, and switching may intervene, in transferring from one road to the other, and switching may follow, in transferring from the point at which it was received on the line of the receiving carrier to its team tracks or industrial sidings on its own line; yet the character of the service remains the same. It is a definite service, rendered between two definite points, an initial and a terminal, and the switching becomes merely an incident to the haul. Terminal facil-

ities, switching tracks, team tracks, and spur tracks to industrial sidings, are merely conveniences at the destination or initial point of the transportation, and are aids in the preparation at the beginning or in the completion at the end of a haul; and it would seem to be wholly immaterial that the initial point at which the goods are received for transportation and the point of delivery are within the industrial limits or switching district of the receiving company. The switching service is but an incident to a line haul. Switches, team tracks, industrial sidings, and spur tracks, are necessary to prevent the congestion which would result from requiring all carload freight to be delivered at the freight depots of the respective roads, and, in a very proper sense, are shipping stations. The fact that the freight movement begins and ends within the limits of the city, does not take from it its character of an actual transportation between two termini. See, also, *Doppes Sons Lbr. Co. v. Cincinnati, N. O. & T. P. R. Co.,* 92 Ohio 206 (110 N. E. 640).

Our conclusion is that switching is an incident to a line haul, and that there is no such thing as "switching service," technically, independent of a line haul. We conclude on this first point that the services rendered were line haul services, and that the defendant is entitled to the tariff rate fixed for line haul services in the amount demanded by the company, unless defeated by the matters to which attention is hereinafter called.

2. CARRIERS: control and regulation: tariff rates: action to recover: discrimination: effect.

It is the claim of the plaintiff that even if, as a matter of fact, it be a line haul, the defendant is not entitled to exact the sum demanded for these services, for the reason that, by its conduct, it has construed the services rendered to be a switching service, and has exacted from other companies, situated as this company is situated, and under practically the same conditions, payment as for a switching service, to wit, $2 for the Milwaukee and

$2 for the defendant company; and that to allow defendant now to charge this company more than it charged other companies would be to permit it to discriminate unjustly between this company and the others, to its great prejudice.

It is conceded in the stipulation on which this case was submitted that, during the year 1914, carload lots of clay products consigned from the Mason City Brick & Tile Company, American Brick & Tile Company, North Iowa Brick & Tile Company, to the Decker Packing Plant, city of Mason City, The Lehigh Portland Cement Company and the Northwestern Portland States Cement Company, were delivered by the defendant company to said companies on a charge of $4 per car, which charge consisted of the switching charge of the Milwaukee Company, of $2, and the switching charge of $2 for the defendant company; that such carload lots were intended for the use of the consignees; and that each of the consignees had an industry located on a track of the defendant company, or a track connected therewith; that the delivery of said cars to said consignees was made by delivery upon the particular track of the consignee; that the movement of the cars was had by switching engines on both roads. It was further conceded that the Mason City Sand & Gravel Company, a company connected by spur track with the Milwaukee, and just south of plaintiff's plant, consigned carloads of sand and gravel, under similar circumstances and under like conditions, to all or some of the above named consignees, and that the sand and gravel were handled as in this case. It is also conceded that the Mason City Sand & Gravel Company consigned certain carloads of sand and gravel to themselves, under like circumstances as attended the shipment in question, at the rate of $4 per car. It is further admitted that the rates and charges demanded by the defendant company on the carload shipments of sand and gravel involved in this action were and are in accordance with the published tariffs of the defendant com-

pany and the Milwaukee Company in force at the time the shipments were made for line hauls. It is further admitted that the Railroad Commissioners, under the provisions of Section 2125 of the Code, as amended by the Acts of the Thirty-fourth General Assembly, Chapter 95, Section 1, have never taken any action to define or establish a switching district, or define an industrial vicinity in Mason City. It is further admitted that the yard limits of the Milwaukee road are within Mason City, and that the leads to the Quimby Company are within the Mason City yard limits of the defendant company, as are also those of the consignees to which the consignments have been made, as hereinbefore indicated. It was further admitted that the published tariff rates of the defendant company in force at the time of the movements of the cars in question contained this provision:

"Public team tracks or sidings, etc., of the defendant company, the M. S. N. Ry. Co., and S. I. T., for loading or unloading cars, are exclusively for handling their track, unless otherwise provided."

It is further conceded that, if the plaintiff's theory is right, the defendant is entitled to have judgment against the plaintiff at the rate of $4 a car for the cars shipped, or $156, and no more; that, if the defendant's theory is correct, the amount demanded by the defendant should be assessed against the plaintiff, to wit, $511.81.

The court found for the defendant. Plaintiff appeals.

Out of the stipulation arises this question: Does the fact that the defendant charged and received from other companies a lower rate for services like that rendered in this case than it is now demanding of the plaintiff, prevent the defendant from recovering of the plaintiff its published tariff rate for line haul services? Or, in other words, has the defendant, by its conduct in dealing with these other companies, so construed the services rendered that it is not now in a position to assert against the plaintiff that it is entitled

to a larger sum for the services rendered than that exacted from others for like services? Or, in other words, does the statute against discrimination stand in the way of its recovering more than it charged and received from other companies for like services, under like conditions and situations?

We have found that the services rendered were line haul services. The stipulation is that, for such services, under the published tariff rate, the plaintiff is entitled to the sum demanded. Defendant is not asking more of the plaintiff than, under the published tariff rate, it is entitled to. Is it estopped from insisting that plaintiff pay the published tariff rate for this service because it has rendered for other companies the same service at a lower rate? We have a statute against unjust and unfair discrimination, for a violation of which the legislature has imposed a penalty. We have also a statute making it unlawful for a company to charge or receive more or less than its published tariff rates. The fact, if it be a fact, that the defendant has violated the statute against unjust discrimination, cannot, we think, justify us in compelling the defendant, by decree or judgment, to violate the statute prohibiting it from charging or receiving more or less than the published tariff rate requires. It is no defense on the part of the plaintiff to say that the railroad company has violated this statute against unfair discrimination by charging others less than the tariff rate. To say this is to say that, because you have once sinned, you must continue to sin. Moreover, is it a discrimination, in the sense of the statute? Is the act of the defendant in insisting that this plaintiff pay no more and no less than the published tariff rate a discrimination against it, such as is contemplated by the statute? Was it the thought of the legislature that a violation of the published tariff rate in one or more instances would be a justification for a further violation? Would the fact that the company, in some instances, has violated the statute by charging a

lower rate for services rendered than was provided for in its published tariff rates, justify other parties in insisting that they, too, be served for a lower rate than the published tariff rate fixed for the services rendered? Is not the remedy, if there be any, found in the penal and other provisions of the statute lodged against unjust discrimination and a violation of the published tariff rate?

Section 2125, Code Supplement, 1913, provides:

"It shall be unlawful for any common carrier subject to the provisions of this chapter to make or give any preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic, in any respect whatsoever, or subject any particular person  *  *  *  or locality, or any particular description of traffic, to any prejudice or disadvantage in any respect whatsoever.  *  *  *  All common carriers subject to the provisions of this chapter shall, according to their respective powers, afford all reasonable, proper and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding and switching of cars, and for the receiving, forwarding and delivering of passengers and property to and from their several lines, and to and from other lines and places connected therewith; and shall not discriminate in their accommodations, rates and charges between such connecting lines. Any common carrier may be required to switch and transfer cars for another, for the purpose of being loaded or unloaded, upon such terms and conditions as may be prescribed by the board of railroad commissioners. The switching service of common carriers is hereby defined to be the shifting of loaded or empty cars from one main line or siding to another main line or siding at an industry, or at a group of industries, or at a station, village or city, and within its industrial vicinity, as may be defined by the board of railroad commissioners, by means of switches and connecting tracks."

The theory of the law is that rates shall be uniform; that for like services a fixed rate shall be exacted and paid. The company has a right to fix the rates, but it must publish its tariff rates, so that all may know the rate at which services may be demanded and received. These rates, once fixed and published, are binding upon the company while in force. For like services, it can charge but the tariff rate to each shipper. If these rates are unfair or unjust, the railroad commissioners, upon application, may fix such rates as are reasonable.

Section 2128 of the Code of 1897 provides:

"Every common carrier  *  *  *  shall print and keep for public inspection schedules showing the rates, fares and charges for the transportation of passengers and property which it has established, and which are in force at the time upon its railroad.  *  *  *  No advance shall be made in the rates, fares and charges which have been established and published  *  *  *  except after ten days' public notice, which shall plainly state the changes proposed to be made in the schedules then in force,  *  *  *.  When any such common carrier shall have established and published its rates,  *  *  *  it shall not charge, demand, collect or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates  *  .*  *  as may at the time be in force."

Code Section 2130 provides that, for a violation of either of these statutes, or any of the statutes against which the statute is lodged, it shall be liable to the person or persons injured thereby for three times the amount of damages sustained in consequence, etc.

Code Section 2132 provides that, for a wilful violation of any of these statutes, the company shall be guilty of a misdemeanor, and shall, upon conviction thereof, be fined

not more than $5,000 nor less than $500 for each offense.

Code Section 2138 provides that the rates thus fixed in all actions against the railroad corporations wherein there are involved the charges thereof for the transportation of any freight or cars, or any unjust discrimination in relation thereto, shall be taken as prima-facie evidence in all courts that the rates fixed therein are reasonable and just maximum rates of charge, for which said schedules have been prepared. These rates, however, are subject to supervision by the railroad commission.

Code Section 2139 provides for complaints to the board of railroad commissioners of the reasonableness of the rates fixed by the railway company.

Code Section 2140 provides for a hearing before the railroad commissioners as to the reasonableness of the rates fixed.

Code Section 2141 provides for a determination by the railroad commissioners of the reasonableness of the rates fixed, with power to fix rates that are reasonable.

On the trial of the case, the following stipulation was entered into:

"It is further admitted that the rates and charges demanded by the defendant company on carload shipments of sand and gravel involved in this action were and are in accordance with the published tariffs of the defendant company and the Chicago, Milwaukee & St. Paul Railway Company, in force at the time said shipments moved, the same being $2 per car switching charge for movement on the Chicago, Milwaukee & St. Paul Railway Company tracks, and $.25 per ton for movement on the Minneapolis & St. Louis Railroad Company, except that, on those cars where the revenue collected by the Minneapolis & St. Louis Railroad Company under the said $.25 per ton rate exceed $10, that the defendant then assumed the payment of the said switching charge of the Chicago, Milwaukee & St. Paul

Railway Company, or so much of said switching charge as the amount collected by the defendant company under the $.25 per ton rate exceed $10; that said $.25 per ton rate, it is admitted, being the published tariff charge for a haul of five miles or less, under the Iowa Distance Tariff then in force, said distance tariff being a schedule established by the railroad commission of the state of Iowa, and which schedule had been adopted by the defendant company in its published tariffs at the time the said shipments moved. The said $.25 per ton rate above mentioned is not a switching charge."

From this stipulation it appears that the amount demanded by the defendant was the published tariff rate for the services rendered. It therefore appears that defendant is demanding and exacting of the plaintiff only the rate fixed in its published tariff for the character of services which we find was actually rendered by the defendant. It follows, therefore, that the fact that the defendant company rendered like services for other industries at a lower rate does not entitle the plaintiff, in this case, to insist that the defendant now further violate the law, and its duty under the law, and charge the plaintiff a smaller sum than is so fixed in its tariff schedule.

When the defendant demands only what, under the law, it is entitled to, it is no defense to say that it has served other companies for a lower rate than is demanded. Such contention makes no defense against the demand that the plaintiff pay for the services rendered, the published tariff rate.

We have examined the Kentucky case reported in 143 Ky. 73 (135 S. W. 768), *Crescent Coal Co. v. Louisville & N. R. Co.*, and are not persuaded by its reasoning to a different conclusion than we here reach. The rights demanded by the defendant were in accordance with the published tariff rates established by the railroad commission. To

charge more or less than that rate for the services rendered is to violate the provisions of Section 2128, hereinbefore referred to.

For the reasons hereinbefore set out, the judgment of the district court is—*Affirmed.*

PRESTON, C. J., SALINGER and STEVENS, JJ., concur.