The CINCINNATI GAS & ELECTRIC COMPANY, Appellee,

v.

JOSEPH CHEVROLET COMPANY, Appellant.

[Cite as *Cincinnati Gas & Elec. Co. v. Joseph Chevrolet Co.*, 153 Ohio App.3d 95, 2003-Ohio-1367.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–020317.

Decided March 21, 2003.

Eric S. French, for appellee.

Lindhorst & Dreidame, James C. Frooman and Bradley D. McPeek, for appellant.

MARK P. PAINTER, J.

{¶ 1} A public utility backbilled its customer for unmetered gas consumption over a 23-month period. The need to backbill was caused by the public utility's mistakes. We are asked to decide whether the public utility met its burden of proof as to the amount of the bill, whether the public utility's customer could assert the equitable defenses of laches and estoppel to preclude its obligation to pay for the unmetered services it received, and whether these issues fell under the trial court's subject-matter jurisdiction. We conclude that the public utility demonstrated the amount of unmetered gas used, that application of laches or estoppel to preclude payment of the utility bill would violate public policy, and that the defenses raised by the customer fell under the trial court's subject-matter jurisdiction. We also conclude that the jury's verdict as to the amount owed for the unmetered consumption of 144,479 CCF of gas was against the manifest weight of the evidence.

{¶ 2} Appellee, Cincinnati Gas & Electric Company ("CG&E"), sued appellant, Joseph Chevrolet Company ("Joseph"), seeking $79,549.38 for unmetered gas consumption from March 5, 1996, through February 19, 1998. Both parties filed summary-judgment motions, which the trial court denied. CG&E argued in its motion that the Public Utility Commission of Ohio ("PUCO") had exclusive jurisdiction over any matter that Joseph could assert as an affirmative defense, in particular CG&E's failure to monitor its equipment, the correctness of CG&E's bill for unmetered usage, and Joseph's liability for the usage. In its summary-judgment motion, Joseph contended that CG&E was precluded from collecting the unpaid balance because of laches, estoppel, and CG&E's inability to prove the amount of unmetered gas consumption. In its motion to reconsider the denial of summary judgment, CG&E also asked the trial court to stay the proceedings and to instruct Joseph to file a complaint with PUCO. The trial court denied the motion, and the case went to trial. A jury found for CG&E and awarded $79,549.38 in damages. Joseph moved for judgment notwithstanding the verdict, a new trial, or a remittitur. The trial court denied Joseph's motion.

## I. CG&E's Mistakes Result in Backbilling Joseph for Gas Usage

### A. A Tight-and-Tally Inspection

{¶ 3} Joseph, a Chevrolet dealership, occupied two buildings, each separately metered and billed by CG&E. The meter at issue was installed on June 5, 1995, and was connected to Joseph's work facility and body repair shop. The meter registered no gas usage for June and July 1995. On January 4, 1996, CG&E measured gas usage of 35,761 CCF. (CCF represents 100 cubic feet of gas.) The next meter reading, taken on March 5, 1996, indicated gas usage of 33,885

CCF. A CG&E employee noticed that the meter was reading backwards and requested a "tight and tally" inspection. The tight-and-tally inspection took place on March 8, 1996, and the inspector reported that the meter was tight and tally. This inspection entailed a visual examination of the meter to determine whether the hands on the dials were tight and properly moving, but CG&E did not inspect the meter to determine whether it was correctly measuring gas usage. The meter also passed an unidentified test in April 1996.

## B. Continued Unmetered Gas Usage

{¶ 4} For the next several months, the gas usage recorded by the meter was in either single or double digits. Consumption for December 1997, January 1998, and February 1998 was registered at zero. During that time, CG&E billed Joseph for the reflected gas usage, and Joseph paid its bills. In February 1998, CG&E issued another work file on the meter. That same month, CG&E replaced the meter, concluding that it was defective.

## C. CG&E Loses Track of Joseph's Account

{¶ 5} Joseph's account should have been forwarded to CG&E's revenue-protection group for rebilling. Because of a merger and resulting internal confusion, the account was not forwarded. Sometime in January 1999, CG&E discovered that mistake and on February 11, 1999, Thomas Jump, a CG&E billing analyst, sent notice to Joseph that it would be billed for unmetered gas consumption from March 5, 1996, through February 19, 1998. The notice requested that Joseph contact Jump if it had any questions concerning the billing. Joseph did not do so.

## D. The Necessity of a Rebilling by a Public Utility

{¶ 6} Jump testified that rebilling was necessary because CG&E was a regulated industry, and because PUCO encouraged it to keep its rates as low as possible. According to Jump, if a customer that had used unmetered gas did not reimburse CG&E, the lost amount would be rolled into the rates and "everyone [would have] to pay for it." CG&E's Gas Service Regulations filed with PUCO (PUCO Gas No. 18, Sheet Nos. 23.4 and 24.5) provided that nonreceipt of bills did not affect a customer's obligation for payment and that undercharges could be computed on the basis of a consumer's prior or later use "in accordance with the rates in effect during the period."

## E. Estimating Unmetered Gas Usage

{¶ 7} Jump estimated Joseph's unmetered gas usage for the period of March 1996 to February 19, 1998, by using a sample period from February 1998 to February 1999. (He used subsequent usage and not prior usage because

subsequent usage was more readily available to him and because the previous meter's malfunctioning made prior readings suspect.) He used heating degree-days (an accepted industry method for estimating usage that takes into account temperature fluctuations) for the sample period plus the amount of gas used during the sample period and compared those figures with the degree-days when the meter was not registering. That provided Jump with an estimate of usage over a period of time based on Joseph's usage patterns and the degree-days. Jump estimated a usage of 144,479 CCF. Jump testified that the rates for gas in effect from 1996 to 1998 were applied to the estimated usage. After giving Joseph a credit of $3,220.82, the amount Joseph had paid for the applicable period, CG&E billed Joseph $79,549.38. Eighteen months after sending the notice letter, CG&E sued Joseph to collect for the unpaid usage.

## II. Joseph's Appeal

{¶ 8} Joseph did not argue below that it had not consumed the gas, only that CG&E could not prove the amount of gas that it had used during the unmetered period. It also argued that it should be relieved from its payment obligation under the common law doctrines of laches and equitable estoppel because of CG&E's negligence in failing to maintain and to monitor the gas meter, failing to notify Joseph that the meter was malfunctioning, and failing to timely bill it for unmetered gas consumption.

{¶ 9} In its appeal Joseph raises three assignments of error. It contends that the trial court erred by (1) failing to grant it a directed verdict, (2) refusing to instruct the jury on laches and estoppel, and (3) failing to grant it judgment notwithstanding the verdict.

{¶ 10} Although we ultimately determine that Joseph is entitled to a new trial because the verdict was against the manifest weight of the evidence, we address Joseph's first and third assignments because they raise sufficiency issues. We also address Joseph's second assignment because the issue is likely to reappear during the new trial.

## III. CG&E's Cross–Assignments

{¶ 11} CG&E raises three cross-assignments under App.R. 3(C)(2). It contends that the trial court erred by failing to grant its summary judgment motion. It also contends that the trial court erred by failing to grant its motion for a directed verdict at the end of its case-in-chief. Last, CG&E argues that the trial court erred by failing to grant its motion for directed verdict after the presentation of all the evidence. CG&E's arguments in support of its cross-assignments challenge the trial court's subject-matter jurisdiction over Joseph's defenses.

{¶ 12} App.R. 3(C)(2) allows an appellee to support the trial court's judgment on grounds that the trial court rejected.[1] Under App.R. 3(C)(2) and R.C. 2505.22, we may consider cross-assignments only if we have otherwise determined to reverse the trial court's judgment.[2] An assignment of error brought without a notice of appeal "may be used by the appellee as a shield to protect the judgment of the lower court but may not be used by the appellee as a sword to destroy or modify that judgment."[3] We address the cross-assignments below.

## IV. Joseph's Motions for Directed Verdict and Judgment Notwithstanding the Verdict Were Properly Denied.

{¶ 13} Joseph's first two assignments challenge the trial court's denial of its motions for a directed verdict and judgment notwithstanding the verdict. We review a ruling on either motion under the same standard. Both motions present a question of law by challenging the sufficiency of the evidence; thus, they are reviewed de novo. Accordingly, "[w]here there is substantial competent evidence favoring the nonmoving party so that reasonable minds might reach different conclusions," motions for judgment notwithstanding the verdict and directed verdict must be denied.[4] Because the common standard of review applies to different stages in the trial proceedings, we address Joseph's first and third assignments before we address its second assignment. Because our ultimate disposition is based on the facts addressed in Joseph's first assignment, we address Joseph's third assignment first.

### A. Joseph's Motion for Judgment Notwithstanding the Verdict

{¶ 14} In its third assignment, Joseph argues that it was entitled to judgment notwithstanding the verdict because the usage number indicated on the invoice was attributed to the period from March 5, 1996, through March 5, 1998, thus erroneously including 14 additional days after the installation of the new meter. But the evidence before the jury also included testimony as to how CG&E calculated the usage and how the calculation was limited to the period from

---

1. See Staff Note to App.R. 3(C)(2).

2. See *Parton v. Weilnau* (1959), 169 Ohio St. 145, 8 O.O.2d 134, 158 N.E.2d 719, paragraph seven of the syllabus; *Seringetti Constr. Co. v. Cincinnati* (1988), 51 Ohio App.3d 1, 553 N.E.2d 1371.

3. *Parton v. Weilnau,* 169 Ohio St. at 171, 8 O.O.2d 134, 158 N.E.2d 719; see *Allied Erecting & Dismantling Co., Inc. v. Youngstown,* 7th Dist. No. 00 CA 225, 2002-Ohio-5179, ¶ 70, 151 Ohio App.3d 16, 783 N.E.2d 523.

4. (Citations omitted.) *Allied Erecting & Dismantling Co., Inc.,* supra, at ¶ 22; see *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.* (1998), 81 Ohio St.3d 677, 679, 693 N.E.2d 271 (motion for directed verdict).

March 1996 to February 1998. Further, CG&E's Exhibit 14 provided that although the rebill dates were March 5, 1996, through March 5, 1998, Joseph's gas usage was actually calculated for the period from March 6, 1996, through February 18, 1998, and that the amount used during that time equaled 14,4479 CCF. Thus, there was substantial, competent evidence supporting a finding for CG&E, the nonmoving party, upon which reasonable minds could reach different conclusions. We overrule Joseph's third assignment.

### B. Joseph's Motion for Directed Verdict

■ {¶ 15} In support of its first assignment, Joseph contends that there was no evidence of the rates in effect for the gas it allegedly used during the applicable period. The parties placed in evidence the bills received by Joseph for the applicable period, which contained the rates for those months. We have reviewed the evidence and conclude that there was evidence sufficient to defeat Joseph's motion for a directed verdict. We find no merit in Joseph's first assignment.

{¶ 16} We acknowledge that the rates applied by CG&E to the amount of unbilled usage were set as a matter of law for the applicable periods of time. The legislature has determined that public utilities must be highly regulated and has set forth the framework of that regulation in R.C. Title 49. The rates charged to a public utility's customers are fixed. PUCO has authority to administer and enforce the provisions of R.C. Title 49, and under R.C. 4905.30 "every public utility in the state is required to apply for PUCO approval of tariff schedules that detail the rates, charges, and classifications of their services."[5] This requirement exemplifies what is known as the filed-rate doctrine, which, under R.C. 4905.33, "mandates that a public utility must charge the tariff rates approved by the PUCO," unless permitted otherwise under PUCO's supervision.[6]

■ {¶ 17} Thus, "a utility has no option but to collect the rates set by the commission and is clearly forbidden to refund any part of the rates so collected."[7] The rates published with PUCO are the lawful rates until the Ohio Supreme Court sets them aside as being unreasonable or unlawful.[8]

---

**5.** *Gary Phillips & Assoc. v. Ameritech Corp.* (2001), 144 Ohio App.3d 149, 153, 759 N.E.2d 833.

**6.** Id.

**7.** *Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel. Co.* (1957), 166 Ohio St. 254, 257, 2 O.O.2d 85, 141 N.E.2d 465.

**8.** See id.

## C. The Jury's Verdict Was Against the Manifest Weight of the Evidence

{¶ 18} But that does not end our analysis. Although the trial court properly denied Joseph's motions, we conclude that the jury's verdict was against the manifest weight of the evidence on the issue of the amount owed by Joseph. Accordingly, Joseph should have been granted a new trial.

{¶ 19} While App.R. 12(A) states that we need only address errors raised and briefed, "nothing prevents a Court of Appeals from passing upon an error which was neither briefed nor pointed out by a party."[9] When this occurs, "factual conclusions reached by a Court of Appeals must be based upon evidence in the record."[10] We are not precluded from considering "such issues in the interest of justice that have not been raised by the parties."[11] While fairness generally dictates that we give the parties an opportunity to brief the issue, we believe that the opportunity is unnecessary in this case. The record that was before the trier of fact is before us. There is nothing new that the parties can add. In reviewing the record, we have determined that the verdict is not supported by some competent, credible evidence going to all the essential elements of the case.[12] While CG&E offered evidence concerning the gas usage, the evidence of the rates was unclear at best. Thus, we reverse the judgment against Joseph and remand for a new trial on the amount of money Joseph owes CG&E for unmetered gas usage.

## V. The Doctrines of Laches and Estoppel Are Inapplicable to a Public Utility

{¶ 20} In its second assignment, Joseph challenges the trial court's refusal to charge the jury on the doctrines of estoppel and laches. Jury instructions are proper if they correctly state the law as applied to the facts of the case and if "reasonable minds might reach the conclusion sought by the instruction."[13]

{¶ 21} Joseph was not entitled to its requested instructions because the doctrines are inapplicable to public utilities as a matter of law. Application of estoppel and laches would violate a universal public policy of equal treatment of a

---

9. *C. Miller Chevrolet, Inc. v. Willoughby Hills* (1974), 38 Ohio St.2d 298, 301, 67 O.O.2d 358, 313 N.E.2d 400.

10. Id.

11. *Matthews v. Matthews* (1981), 5 Ohio App.3d 140, 146, 5 OBR 320, 450 N.E.2d 278.

12. See *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

13. *Matheson v. Morog* (Feb. 2, 2001), 6th Dist. No. E–00–017, 2001 WL 85149, citing *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828.

public utility's customers. Support for our conclusion is found in the conclusions of a majority of jurisdictions that have considered the issue, two Ohio cases, and Ohio's statutory prohibition against price discrimination by a public utility.

## A. Other Jurisdictions

{¶ 22} Other jurisdictions have considered whether a consumer of a public utility's service can assert the defense of equitable estoppel or laches to preclude the utility from collecting the full amount due when the consumer has been underbilled. The majority of courts have held that their public-utility laws forbid the use of common-law defenses.[14] They have concluded that the public policy of maintaining equality among consumers without preferential privileges " 'supercedes the ordinary doctrine of estoppel [or laches], so far as that would interfere with the accomplishment of the dominant purpose of the act. It does not permit the inequality of rates to arise indirectly through the application of estoppel, which it was the aim of the act to suppress directly.' "[15] Thus, where a statute requires a public utility to charge similarly situated customers according to a standard rate schedule, it contravenes public policy to preclude a public utility from collecting the full amount due for its services, even where the public utility has negligently underbilled its customer.[16]

{¶ 23} As explained by one commentator, "The general utility rule provides that in instances of mistaken underbilling by a public utility, the erring company holds not only the right, but the obligation, to collect the underpayment. Neither the reason for the underbilling nor the impact on the customer will mitigate the effect on the operation of this rule. In refusing to rely on mistake and estoppel

---

**14.** See *Memphis Light, Gas & Water Div. v. Auburndale School Sys.* (Tenn.1986), 705 S.W.2d 652; *Sigal v. Detroit* (1985), 140 Mich.App. 39, 362 N.W.2d 886; *Corporation De Gestion Ste-Foy, Inc. v. Florida Power & Light Co.* (Fla.App.1980), 385 So.2d 124; *Goddard v. Pub. Serv. Co. of Colorado* (1979), 43 Colo.App. 77, 599 P.2d 278; *Chesapeake and Potomac Tel. Co. v. Bles* (1978), 218 Va. 1010, 243 S.E.2d 473; *Haverhill Gas Co. v. Findlen* (1970), 357 Mass. 417, 258 N.E.2d 294; *Wisconsin Power & Light Co. v. Berlin Tanning & Mfg. Co.* (1957), 275 Wis. 554, 83 N.W.2d 147; *Cummings Sand & Gravel Co. v. Minneapolis & St. L. Ry. Co.* (1918), 182 Iowa 955, 166 N.W. 354. But, see, *Laclede Gas Co. v. Solon Gershman, Inc.* (Mo.App.1976), 539 S.W.2d 574 (estoppel not a defense where error caused by defective meter, but customer was entitled to a setoff for any damages); *Interstate Power Co. v. Waukon Manor, Inc.* (Iowa App.1989), 447 N.W.2d 574 (statutory language that public utility shall not subject any person to unreasonable prejudice or disadvantage created an exception to equal charges).

**15.** See *Haverhill Gas Co. v. Findlen,* supra, 357 Mass. at 420, 258 N.E.2d 294, quoting *New York, N.H. & H.R.R. v. York & Whitney Co.* (1913), 215 Mass. 36, 40, 102 N.E. 366. Accord *Pennsylvania RR. Co. v. United Collieries, Inc.* (1938), 59 Ohio App. 540, 548, 12 O.O. 503, 18 N.E.2d 1000.

**16.** See *Memphis Light, Gas & Water Div. v. Auburndale School Sys.,* supra, 705 S.W.2d at 653–654.

in the underbilling context, most courts reason that invoking equitable estoppel [or laches] against a public utility would violate the strong public policy against discriminatory rates. * * * Courts will not consider a utility's responsibility for an underbilling when determining whether the utility may collect an additional amount due from a customer. Neither negligence nor willful misrepresentation relieves the utility of the right or the responsibility to collect the rates established by the tariff. A tariff is legislative in character. Once approved by a state public utility commission, it possesses the same binding effect as a statute. Accordingly, rates are mandatory; a utility has no discretion to change them unless the change is presented to and approved by the regulatory commission."[17]

### B. Ohio Support

{¶ 24} Ohio's public-utility statutes clearly set forth a public policy that public utilities cannot discriminate among their customers. A public utility must file its rate schedules with PUCO.[18] The public utility is forbidden to collect a different rate than that specified in the schedules.[19] Further, a public utility cannot directly or indirectly collect less from customers in like circumstances, for like or substantially similar services.[20] This is to prevent a public utility from using its monopoly power "to force higher rates on some customers in order to subsidize lower rates given to other, more favored customers."[21] The policy against discrimination is maintained even where a customer may not have the means to pay the rate. Where a public utility's low-income customer participates in a Percentage of Income Payment Plan (PIP) that allows a percentage of the customer's income to be paid for services in lieu of the regular monthly charges, the plan does not preclude a suit by the utility for any outstanding arrearages.[22] Thus, the plan " 'does not constitute free service or a rebate.' "[23]

---

**17.** (Footnotes omitted.) Colton, Protecting against the Harms of the Mistaken Utility Undercharge (1991), 39 Wash.U.J.Urb. & Contemp.L. 99, 103–105.

**18.** R.C. 4905.30.

**19.** R.C. 4905.32.

**20.** R.C. 4509.32 and 4509.33.

**21.** (Citation omitted.) *Consumers' Counsel v. Pub. Util. Comm.* (1991), 61 Ohio St.3d 396, 406–407, 575 N.E.2d 157 (Brown, J., dissenting).

**22.** See *Dayton Power & Light Co. v. Barnes* (Feb. 23, 1989), 2nd Dist. No. 11223, 1989 WL 14722.

**23.** Colton, Protecting against the Harms of the Mistaken Utility Undercharge, 39 Wash. U.J.Urb. & Contemp.L. at 111, fn. 82, quoting *In re Investigation into Long–Term Solutions Concerning Disconnections of Gas & Elec. Serv. in Winter Emergencies* (Nov. 23, 1983), No. 83–303–GE–COI, at 14.

{¶ 25} Allowing a customer to pay less because of a malfunctioning meter results in the public utility's service not being supplied "under a given rate structure"[24] because the customer with the malfunctioning meter is paying less than a customer with a properly working meter for the same amount of gas. Accordingly, Ohio has determined that the practice of backbilling for gas used during the time a meter has failed to adequately measure consumption is not improper.[25] The legislature, while limiting backbilling of residential customers to 365 days immediately prior to the date the utility remedies the meter inaccuracy,[26] has placed no similar limitation on nonresidential meter inaccuracies. Nor do CG&E's regulations supply one.

{¶ 26} The Ohio Supreme Court has explained that any unfairness for backbilling "relate[s] to the public served by the utility, and not just to the customers being backbilled."[27] It has held that in the absence of statutory authority, there can be no one-year limitation on backbilling based on the public utility's negligent failure to discover a defective metering of consumption.[28] This is because "[p]ublic utilities are not like private corporations."[29] If the utility is limited, the cost of the unbilled service is spread "to all the utility's customers, rather than to the customers who actually used the service the utility provided. The parties at fault do not pay, the public does."[30]

{¶ 27} The Ohio Supreme Court recognized this policy in 1920 when it determined that PUCO was without jurisdiction to enforce specific performance of a contract between a customer and a utility company where the customer sought a rate different than the scheduled rate. The court concluded that to allow the consumer to be charged at less than the scheduled rate would constitute discrimination in contravention of the express provisions of the public-utility statutes.[31]

---

24. See *Norman v. Pub. Util. Comm.* (1980), 62 Ohio St.2d 345, 352, 16 O.O.3d 400, 406 N.E.2d 492.

25. See id. at 353, 16 O.O.3d 400, 406 N.E.2d 492.

26. See R.C. 4933.28.

27. *Norman v. Pub. Util. Comm.*, 62 Ohio St.2d at 354, 16 O.O.3d 400, 406 N.E.2d 492.

28. See id., paragraph two of the syllabus.

29. Id. at 354, 16 O.O.3d 400, 406 N.E.2d 492.

30. Id. at 355, 16 O.O.3d 400, 406 N.E.2d 492.

31. See *Coss v. Pub. Util. Comm.* (1920), 101 Ohio St. 528, 130 N.E. 937.

{¶ 28} Our court recognized this policy in 1929 and held that an action for reparations against a public carrier was not allowable. We concluded that the claim was nothing more than an indirect attempt to compel the carrier to charge less for its service than what was specified by its rate schedule. We determined that to allow a lesser charge violated the statute that forbade a railroad to charge more or less compensation than that specified in its rate schedule.[32]

{¶ 29} We sympathize with the situation of a business being "sandbagged" by a large unforeseen bill. But to allow Joseph to assert equitable estoppel or laches would allow it to relieve itself of the obligation to pay for the gas it consumed, thus permitting it to pay less for the same service than other customers had paid during the same time. This would be in direct contravention of the public policy embodied in the public-utility statutes. The legislature is aware of undercharging due to metering inaccuracy under the utility's control.[33] It has determined that only residential customers are entitled to some protection.

{¶ 30} This is one of those situations where absolute equity must "give way to the greater overall good. In adopting a comprehensive scheme of public utility rate regulation the Legislature has found it impossible to do absolute justice under all circumstances."[34] The trial court correctly refused to charge the jury on estoppel and laches. We overrule Joseph's second assignment.

## VI. Cross–Assignments: PUCO Does Not Have Exclusive Jurisdiction over Joseph's Defenses

{¶ 31} CG&E's three cross-assignments raise subject-matter jurisdiction.[35] While a cross-assignment may not be a proper means by which to raise the issue in this case, the issue itself can be raised at anytime.[36]

{¶ 32} PUCO does have exclusive jurisdiction over the majority of issues involving a public utility.[37] In fact, R.C. 4905.26 expressly confers jurisdiction on PUCO to review certain complaints by "any person, firm, or corporation"

---

32. See *Crook v. Baltimore & O.R. Co.* (1929), 32 Ohio App. 263, 167 N.E. 899.

33. See R.C. 4933.28.

34. *Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel. Co.*, supra, 166 Ohio St. at 259, 2 O.O.2d 85, 141 N.E.2d 465.

35. Accord *Hirts Greenhouse, Inc. v. Strongsville* (Sept. 7, 1995), 8th Dist. No. 68374, 1995 WL 527408.

36. See *Fox v. Eaton Corp.* (1976), 48 Ohio St.2d 236, 2 O.O.3d 408, 358 N.E.2d 536, overruled on other grounds in *Manning v. Ohio Library Bd.* (1991), 62 Ohio St.3d 24, 577 N.E.2d 650.

37. Accord *State ex rel. Illuminating Co. v. Cuyahoga Cty. Court of Common Pleas,* 97 Ohio St.3d 69, 2002-Ohio-5312, 776 N.E.2d 92, ¶ 20.

against a public utility. But PUCO does not have exclusive jurisdiction to decide complaints filed by a public utility against its customers.[38] Thus the trial court had subject-matter jurisdiction over CG&E's claim against Joseph for the unpaid gas usage.

{¶ 33} In contrast, "[t]he General Assembly has provided a rather specific procedure by which customers may challenge rates or charges of a public utility that are 'in any respect' unjust, unreasonable, or unlawful, and has designated the commission as the appropriate forum before which such claims are to be heard."[39] Thus PUCO has exclusive jurisdiction over claims concerning the charges and services of a public utility.[40]

{¶ 34} Whether PUCO has exclusive jurisdiction depends on whether we characterize the defenses asserted by Joseph as claims of unjust or unreasonable rates or services. Joseph did not file a counterclaim asserting that CG&E's rates or services were unjust or unreasonable or inadequate. Instead, it asserted the defenses of equitable estoppel and laches and questioned CG&E's ability to prove usage in order to avoid CG&E's claim for the amount owed. If Joseph had filed a counterclaim challenging the reasonableness, adequacy, or justness of the rates CG&E had charged or of the services it had provided, PUCO would have been the proper forum. Because Joseph's defenses were common-law defenses (even though we find them inapplicable here) that challenged rates or services, we find no merit in CG&E's contention that the trial court lacked subject-matter jurisdiction over Joseph's defenses. We overrule CG&E's cross-assignments.

{¶ 35} Thus, we reverse the trial court's judgment and remand this case for a new trial on the issue of the amount of money Joseph owes CG&E for the unmetered gas it used.

Judgment reversed
and cause remanded.

SUNDERMANN, P.J., and WINKLER, J., concur.

---

38. See *Suleiman v. Ohio Edison Co.*, 146 Ohio App.3d 41, 47, 2001-Ohio-3414, 764 N.E.2d 1098, ¶ 22.

39. *Kazmaier v. Toledo Edison Co.* (1991), 61 Ohio St.3d 147, 151, 573 N.E.2d 655.

40. See *State ex rel. N. Ohio Tele. Co. v. Winter* (1970), 23 Ohio St.2d 6, 9, 52 O.O.2d 29, 260 N.E.2d 827.