SHEPHERD, Appellee,

v.

CITY OF CINCINNATI, Appellant.

[Cite as *Shepherd v. Cincinnati,* 168 Ohio App.3d 444, 2006-Ohio-4286.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–050711.

Decided Aug. 18, 2006.

446

Rebecca C. Gee–Meyer, for appellee.

Julia L. McNeil, City Solicitor, and Peter J. Stackpole, Assistant City Solicitor, for appellant.

MARK P. PAINTER, Judge.

{¶ 1} In November 2002, plaintiff-appellee, Gloria Shepherd, then 81, walked out into Harkness Street so that she could get in her husband's car. As she advanced towards the car, she stepped into two potholes, slipped and fell, and fractured her leg. She sued city hall and won. City hall has appealed. We affirm the trial court's judgment in all respects.

{¶ 2} Shepherd sued defendant-appellant, the city of Cincinnati, alleging that the city had negligently maintained Harkness Street, a public road. The jury returned a verdict of $55,000 for Shepherd, but also found that she was 40 percent at fault for her injuries. This finding of comparative negligence left the city liable for $33,000. In this appeal, the city now argues that the trial court erred by (1) denying the city's motions for a directed verdict and (2) denying the city's motion to deduct benefits from collateral sources.

{¶ 3} But we believe the attendant circumstances of this case led to Shepherd's becoming distracted and diverted her attention so that the defects on Harkness Street caused her fall.

{¶ 4} And for a political subdivision to be entitled to an offset for collateral benefits, it must demonstrate that such benefits are actually included in the jury's award. Here, the city failed to propose any jury interrogatories that would have quantified the amount the jury was awarding for medical expenses or pain and suffering. Thus, there could be no setoff for collateral benefits.

## I. A Slip and Fall

{¶ 5} Shepherd had lived at 2045 Harkness Street in the North Fairmont neighborhood of Cincinnati for around 50 years. Harkness is a small, narrow street that did not have any sidewalks at the time of Shepherd's injury. There are only six houses on Harkness, and it is only one and a half lanes wide.

{¶ 6} At the time of the slip and fall, Harkness served as a back entrance to North Fairmont Elementary School. This entrance was used by delivery trucks as well as vehicles dropping off students. Shepherd testified that vehicles traveling on Harkness often drove at a high rate of speed coming off Yoast.

Shepherd stated that because the street is short, it was difficult to see the cars before they came around the corner.

{¶ 7} In November 2002, Shepherd and her husband, Wilbur, decided to go to the bank. Wilbur pulled the car into the street. Shepherd entered the street to get into the car, because the street had no sidewalks. Because Shepherd was worried about cars speeding on Harkness, she was looking down Harkness towards Yoast while she entered the street. Shepherd did not notice that as she stepped towards her car, there were two potholes in her path. She slipped and fell, fracturing her left femur.

{¶ 8} Shepherd's injury required a one-week hospital stay. She was unable to return to her home for three months after the hospital stay because her leg would not support the 20–step climb to her front door. Additionally, Shepherd needed seven months of physical therapy to return to a "normal" walking ability assisted by a cane.

{¶ 9} After the injury, Shepherd's daughter, Mary Geiger, examined the two potholes that had caused Shepherd to slip and fall. She testified that she was able to place her entire foot into one pothole while wearing two-inch heels.

{¶ 10} The city sent two inspectors, Diane Watkins and Greg Ayers, from the traffic and roads division, to examine Harkness. At the time of the injury, both employees agreed that they did not see any dangerous defects on the street. Two years later at the time of trial, Watkins and Ayers revisited Harkness and again concluded that there were no potholes on the street, only scabbing, which is an erosion of the asphalt. Watkins and Ayers both testified that when they measured the scab where Shepherd maintained that she had fallen, the defect had a maximum depth of one and a half inches to two inches.

{¶ 11} After trial, the jury returned a general award of $55,000 for Shepherd. But the jury also determined that she was 40 percent at fault for her injuries. The city moved to deduct benefits from collateral sources, but the trial court denied its motion.

## II.  Motion for Directed Verdict

{¶ 12} In its first assignment of error, the city asserts that the trial court erred by denying its motion for a directed verdict. The city maintains that (1) it owed no duty to Shepherd because she tripped on potholes that were open and obvious, (2) the defect was insubstantial as a matter of law because it was less than two inches, and (3) the city had no actual or constructive notice of the defect.

{¶ 13} We review the denial of a motion for a directed verdict de novo.[1] The trial court may direct a verdict when reasonable minds can come to only one conclusion.[2] In ruling on such motions, the court must construe the evidence in the light most favorable to the nonmoving party.[3] The motion tests the legal sufficiency of the evidence.[4] When there is substantial, competent evidence upon which reasonable minds may reach different conclusions, the court must deny the motion.[5]

### III. Streets and Liability

{¶ 14} To recover on a negligence claim, a plaintiff must prove (1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, and (3) that the breach of the duty proximately caused the plaintiff's injury.[6] Generally, a duty may be established through either the common law, legislative enactment, or the particular facts and circumstances of a case.[7]

{¶ 15} In this case, we address the duty of a municipality to keep its streets free from nuisance. It is well settled that a municipal corporation is not an insurer of the safety of its streets and sidewalks.[8] But it is also well established that a municipal corporation has a duty to keep its streets and sidewalks free from nuisance and in a reasonably safe condition.[9]

{¶ 16} Under R.C. 723.01, municipal corporations have the power to regulate the use of their streets. This power entrusts to municipal corporations "the care, supervision, and control of the public highways, streets, avenues, alleys, side-

1. See *Posin v. ABC Motor Court Hotel, Inc.* (1976), 45 Ohio St.2d 271, 74 O.O.2d 427, 344 N.E.2d 334; *Schafer v. RMS Realty* (2000), 138 Ohio App.3d 244, 741 N.E.2d 155.

2. Civ.R. 50(A)(4).

3. *Posin*, supra.

4. See *Cincinnati Gas & Elec. Co. v. Chevrolet,* 153 Ohio App.3d 95, 2003-Ohio-1367, 791 N.E.2d 1016.

5. Id.

6. See *Chambers v. St. Mary's School* (1998), 82 Ohio St.3d 563, 565, 697 N.E.2d 198, citing *Wellman v. E. Ohio Gas Co.* (1953), 160 Ohio St. 103, 108–109, 51 O.O. 27, 113 N.E.2d 629.

7. Id., citing *Eisenhuth v. Moneyhon* (1954), 161 Ohio St. 367, 53 O.O. 274, 119 N.E.2d 440, paragraph one of the syllabus.

8. See *Kimball v. Cincinnati* (1953), 160 Ohio St. 370, 373, 52 O.O. 237, 116 N.E.2d 708, citing *Dayton v. Glaser* (1907), 76 Ohio St. 471, 81 N.E. 991; *Gibbs v. Girard* (1913), 88 Ohio St. 34, 102 N.E. 299; *Deckant v. Cleveland* (1951), 155 Ohio St. 498, 44 O.O. 448, 99 N.E.2d 609.

9. Id.

walks, public grounds, bridges, aqueducts, and viaducts within the municipal corporation." Any "liability or immunity from liability of a municipal corporation for injury, death, or loss to person or property allegedly caused by a failure to perform" these responsibilities is determined under R.C. 2744.02(A) and (B).

{¶ 17} R.C. 2744.02(B)(3) formerly stated that "political subdivisions are liable for injury, death, or loss to persons or property caused by their failure to keep public roads * * * in repair, and free from nuisance."

{¶ 18} But the language of former R.C. 2744.02(B)(3) requiring political subdivisions to keep public roadways "free from nuisance" was deleted when the statute was amended by Am.Sub.S.B. No. 106, 149 Ohio Laws, Part II, 3500, 3508 (S.B. No. 106), which became effective on April 9, 2003. (What we make of that remains for another day, as the General Assembly left in "in repair," which this street obviously was not.) Because this accident occurred on November 2, 2002, the former version of the statute applies in this case.[10]

{¶ 19} Thus, the city had a statutory and common-law duty to insure that the public roads were in repair and free from nuisances. The issue then is whether the city breached that duty and proximately caused Shepherd's injuries. Here the city maintains that (1) there was no actual or constructive notice of the defect, (2) the defect was an open and obvious condition of the roadway that Shepherd needed to guard against, and (3) the defect was insubstantial as a matter of law because it was less than two inches. Translated: there was no notice because it was so small, but it was obvious because it was so large.

### IV.  Constructive Notice

{¶ 20} Before liability could be imposed upon the city under R.C. 2744.02(B)(3), Shepherd must have demonstrated that the city had actual or constructive notice of the defects on Harkness. The Ohio Supreme Court has stated that constructive notice occurs when (1) the nuisance existed in a manner that it could or should have been discovered, (2) it existed for a sufficient length of time to have been discovered, and (3) if it had been discovered, it would have created a reasonable apprehension of a potential danger or an invasion of private rights.[11]

{¶ 21} The city contends that there was no evidence that the condition created a reasonable apprehension of danger and no evidence about the length of time the defect existed.

---

10.  See *Harp v. Cleveland Hts.* (2000), 87 Ohio St.3d 506, 721 N.E.2d 1020.

11.  See *Beebe v. Toledo* (1958), 168 Ohio St. 203, 207, 6 O.O.2d 1, 151 N.E.2d 738, citing *Leipsic v. Gerdeman* (1903), 68 Ohio St. 1, 67 N.E. 87.

{¶ 22} At trial, Shepherd and her daughter testified that during the months preceding the accident, they had seen Cincinnati Gas & Electric and city trucks on Harkness working to patch a section of the road. Shepherd also noted that since the city had constructed Harkness, it was aware that there were no sidewalks.

{¶ 23} The city countered Shepherd and her daughter's testimony with testimony from the two city inspectors, Watkins and Ayers. Both testified that they did not believe the defect was a hazard that required a cold patch or an emergency repair. They further testified that scabbing of this kind could have occurred either gradually or overnight.

{¶ 24} We have examined the photographs in the record. The street looks similar to Berlin after the war. But they built Berlin back.

{¶ 25} The trial court properly instructed the jury on constructive notice—and the jury found that there was credible evidence that the city had constructive notice of the defects on Harkness Street. We are convinced that there was competent evidence upon which reasonable minds could reach different conclusions and that the trial court did not err in denying the city's motion for a directed verdict on the issue of constructive notice.

### V. Scabs and Potholes

{¶ 26} The city maintains that the scabs in front of Shepherd's home were never greater than one and a half to two inches deep. It contends that this depth made the defects in the road insubstantial as a matter of law. But the city also argues that since Shepherd knew about the unevenness of the street, the defects were also open and obvious.

{¶ 27} The Ohio Supreme Court has stated that a city is not accountable for injuries resulting from a pedestrian's failure to heed open and obvious dangers on public walkways.[12] (Though this author, at least, believes that the "open and obvious" doctrine is outmoded and should be simply a factor in the comparative-negligence equation, we must follow the Ohio Supreme Court.) Thus, a pedestrian must use reasonable care to detect and avoid any open and obvious defects. But this doctrine does not gain traction in this case—while the street was in need of repair, we are not persuaded that the whole street was an open and obvious danger to the residents who needed to walk on it to get into their vehicles. Having no sidewalks, they had no other choice.

{¶ 28} And the city seems to believe that a "negligence by ruler" standard still holds—that any variation of two inches or less makes a road defect insubstantial

---

12. See *Norwalk v. Tuttle* (1906), 73 Ohio St. 242, 76 N.E. 617.

as a matter of law. The *Kimball* rule, as it came to be known, had arisen out of a line of cases absolving municipalities of liability when the plaintiff had tripped and fallen over relatively insubstantial height variations between slabs of public sidewalks. The *Kimball* rule provided that a defect in elevation of two inches or less was not actionable as a matter of law.[13]

{¶ 29} But the Ohio Supreme Court modified this rule slightly in *Cash v. Cincinnati*, holding that when additional circumstances allow the case to be distinguished from "the general rule of insubstantialness as found in *Kimball*," whether the defect constitutes negligence presents a jury question.[14] We have thus recognized that the modern formulation of the *Kimball* rule is a rebuttable presumption that height differences on public sidewalks of two inches or less are insubstantial or trivial as a matter of law, absent evidence of other "attendant circumstances" making a difference in elevation unreasonably safe.[15]

{¶ 30} But this case did not involve a public sidewalk—there were no sidewalks on Harkness. But we assume for a moment that a defect in a street is the same as one in a sidewalk.

{¶ 31} Although there is no precise definition of "attendant circumstances," they would include "any distraction that would come to the attention of a pedestrian in the same circumstances and reduce the degree of care an ordinary person would exercise at the time."[16] And attendant circumstances must, taken together, (1) divert the attention of the pedestrian, (2) significantly enhance the danger of the defect, and (3) contribute to the fall.[17]

{¶ 32} In the present case, Shepherd testified that when she had entered the street to get into the car, she was looking down the street for oncoming traffic. Since Shepherd stated that she had witnessed many cars drive down her street at what she perceived to be an excessive speed, she focused her attention down the street.

---

**13.** *Kimball*, 160 Ohio St. 370, 52 O.O. 237, 116 N.E.2d 708.

**14.** See *McLain v. Equitable Life Assur.* Co. (Mar. 13, 1996), 1st Dist. No. C–950048, 1996 WL 107513, citing *Cash v. Cincinnati* (1981), 66 Ohio St.2d 319, 20 O.O.3d 300, 421 N.E.2d 1275.

**15.** See *McGuire v. Sears Roebuck & Co.* (1996), 118 Ohio App.3d 494, 499, 693 N.E.2d 807, citing *McLain*, supra.

**16.** Id., quoting *France v. Parliament Park Townhomes* (Apr. 27, 1994), 2nd Dist. No. 14264, 1994 WL 151658.

**17.** Id., citing *Stockhauser v. Archdiocese of Cincinnati* (1994), 97 Ohio App.3d 29, 33–34, 646 N.E.2d 198.

{¶ 33} We believe that due to her age, the fact that there were no sidewalks for her to use, the narrow construction of Harkness, the fact that she needed to go out into the middle of the street to enter her vehicle, and the speed with which cars frequently traveled Harkness, taken together, Shepherd became distracted and diverted her attention so that the defects on Harkness were significantly enhanced and contributed to her fall. Or at least the jury was entitled to, and did, so conclude.

{¶ 34} We hold that when the evidence is viewed in Shepherd's favor, it supports the conclusion reached by the trial court that reasonable minds might differ as to whether the defect was substantial in light of the attendant circumstances. Thus the jury's verdict was sustainable, and we overrule the city's first assignment of error.

## VI.  Collateral Sources

{¶ 35} In the city's second assignment of error, it argues that the trial court erred by denying its motion to deduct benefits from collateral sources. The city contends that R.C. 2744.05(B) required the court to grant a setoff of the collateral benefits that Shepherd had received. The city reasons that the jury's general award of $55,000 must have included Shepherd's $27,000 in medical bills, which were paid by United Healthcare and Medicare, and thus that it was entitled to a setoff.

{¶ 36} Under R.C. 2744.05(B), "[i]f a claimant receives or is entitled to receive benefits for injuries or loss allegedly incurred from a policy or policies of insurance or any other source, the benefits shall be disclosed to the court, and the amount of the benefits shall be deducted from any award against a political subdivision recovered by that claimant. No insurer or other person is entitled to bring an action under a subrogation provision in an insurance or other contract against a political subdivision with respect to those benefits. The amount of the benefits shall be deducted from an award against a political subdivision under division (B)(1) of this section regardless of whether the claimant may be under an obligation to pay back the benefits upon recovery, in whole or in part, for the claim. A claimant whose benefits have been deducted from an award under division (B)(1) of this section is not considered fully compensated and shall not be required to reimburse a subrogated claim for benefits deducted from an award pursuant to division (B)(1) of this section."

{¶ 37} The Ohio Supreme Court has defined "benefit" as the " '[f]inancial assistance received in time of sickness, disability, unemployment, etc. either from insurance or public programs such as social security.' " [18]  In this case, the city

---

18.  See *Buchman v. Bd. of Edn. of the Wayne Trace Local School Dist.* (1995), 73 Ohio St.3d 260, 264, 652 N.E.2d 952, quoting Black's Law Dictionary (6 Ed.1990) 158.

maintains that it was entitled to a setoff of the benefits that Shepherd had received for her medical bills from either insurance or social security. Not so.

{¶ 38} The Ohio Supreme Court, in *Buchman v. Bd. of Edn. of the Wayne Trace Local School Dist.*, held under R.C. 2744.05(B) that "a collateral benefit is deductible only to the extent that the loss for which it compensates is actually included in the jury's award." [19] While we understand that the court was interpreting a previous version of this statute, the language concerning a setoff for municipalities remains substantially the same. The court noted that R.C. 2744.05(B) provides for a postverdict proceeding in which collateral benefits are "disclosed to the court, and the amount of the benefits shall be deducted from any award." [20] The statute thus places the burden of disclosure on the plaintiff. But the issue of disclosure is "separate and distinct from the issue of the defendant's entitlement to an offset under R.C. 2744.05(B)." [21]

{¶ 39} Thus, for a political subdivision to be entitled to an offset for collateral benefits, it must demonstrate that those benefits are actually included in the jury's award. "[T]he most efficient and effective method, if not the only method, by which to determine whether the collateral benefits to be deducted are within the damages actually found by the jury" is through the submission of jury interrogatories.[22]

{¶ 40} Here, the city failed to propose any jury interrogatories that would have quantified the amount the jury was awarding as damages for medical bills, pain and suffering, or anything else. But the city asks this court to simply accept that the jury's general damage award of $55,000 included Shepherd's $27,000 in medical bills. We cannot do so.

{¶ 41} The city is entitled to a setoff of collateral benefits only when it demonstrates that the jury's award includes those benefits. Because the city did not propose jury interrogatories and instead allowed the jury to make a general award, we cannot read Shepherd's collateral benefits into the jury's award.

{¶ 42} Accordingly, we overrule the city's second assignment of error and affirm the trial court's judgment.

*Judgment affirmed.*

---

19. Id. at paragraph four of the syllabus.

20. Id. at 270, 652 N.E.2d 952.

21. Id.

22. Id.

SUNDERMANN, J., concurs.

GORMAN, P.J., concurs separately.

GORMAN, Presiding Judge, concurring.

{¶ 43} I concur with the majority decision in all respects but one.  As a judge of an intermediate appellate court, I cannot agree with the statement in parentheses in ¶ 27.  Upon its recent reexamination of the open-and-obvious doctrine in the context of comparative negligence, the Supreme Court has said that "the open-and-obvious doctrine remains viable in Ohio." [23]

{¶ 44} Besides, the author of the majority decision has already made a similar statement in *Kilday v. Winn–Dixie Charlotte, Inc.*[24]  Once should be enough.

---

**23.**  See *Armstrong v. Best Buy Co., Inc.,* 99 Ohio St.3d 79, 2003-Ohio-2573, 788 N.E.2d 1088, at ¶ 14.

**24.**  1st Dist. No. C–030013, 2003-Ohio-4697, 2003 WL 22056412, at ¶ 7.