SERINGETTI CONSTRUCTION
COMPANY,
APPELLANT AND CROSS-APPELLEE, *v.*
CITY OF CINCINNATI, APPELLEE AND
CROSS-APPELLANT.

(No. C-870207—Decided
June 29, 1988.)

*Strauss & Troy, Richard Boydston* and *Paul Brent Calico,* for appellant and cross-appellee.

*Richard A. Castellini,* city solicitor, and *William A. Gustavson,* for appellee and cross-appellant.

*Per Curiam.* Plaintiff/appellant/cross-appellee Seringetti Construction Company ("Seringetti") has taken the instant appeal from the entry of judgment upon a jury verdict in favor of defendant/appellee/cross-appellant city of Cincinnati on Seringetti's complaint requesting a declaration that the city had materially modified Seringetti's obligations under a contract for general construction after performance under the contract had begun and seeking damages for extra work thereby incurred. On appeal, Seringetti presents four assignments of error. The city has also appealed in this matter and on appeal advances a single assignment of error.[1]

In the spring of 1984, the city solicited bids for the renovation of a municipal community center. Seringetti was the successful bidder on the general construction portion of the contract, and in August 1984, Seringetti and the city entered into a contract for general construction.

In November 1984, Seringetti filed a complaint against the city seeking a declaration that the city had altered and modified the terms of their agreement with respect to builder's hardware and final cleaning and had imposed on Seringetti the duties of a general contractor and that performance of the contract as modified constituted extra work compensable in the amount of $82,500. The city responded with an answer and a third-party complaint against Glaser & Meyers and Associates, Inc. ("Glaser & Myers"), the architectural firm that had provided the plans and specifications for the project. The city asserted in its third-party complaint that Glaser & Myers and the city had entered into a contract pursuant to which Glaser & Myers agreed to provide specifications for the project and to indemnify the city for any loss arising out of "negligent acts, errors or omissions" on the part of Glaser & Myers in its performance under the contract. The city alleged that the specifications provided by Glaser & Myers were "unskillful, defective, ambiguous and/or prepared without due care," and thus sought indemnification for any liability it might bear to Seringetti. In October 1985, the city voluntarily dismissed its third-party complaint against Glaser & Myers.

In March 1986, Seringetti filed an

---

[1] The city's cross-appeal is taken from the trial court's order of February 24, 1987, entering final judgment on the merits in the city's favor. On the state of this record, we perceive no basis for a determination that the city is, in any legal sense, a party aggrieved by that final judgment, and we must conclude, therefore, that the city has no standing to pursue its own separate appeal in this case. This does not, however, necessarily relieve us of the obligation to respond to the sole assignment of error advanced on the city's behalf. Under R.C. 2505.22, an appellee is permitted to file an assignment of error, as a shield in response to an opposing party's appeal, and that assignment must be addressed by a reviewing court before a final judgment is reversed in whole or in part. In the interest of justice, and to promote judicial economy, we choose to rely on the statute in this case and to view the city's assignment as one advanced in the city's capacity as an appellee to prevent a reversal of the final judgment entered below on February 24, 1987. We will, in addition, address the assignment on its merits for the reasons detailed in later sections of this decision.

amended complaint against the city seeking a declaration that the city had altered and modified the terms of their agreement with respect to builder's hardware, and interior and exterior cleaning, and had imposed on Seringetti the duties of a general contractor, and that performance of the contract as modified constituted extra work compensable in the amount of $127,500. The four issues advanced by Seringetti in its amended complaint, *viz.*, builder's hardware, interior and exterior cleaning, and general contractor duties, were tried to a jury, which returned a general verdict in favor of the city. On February 24, 1987, the trial court entered judgment upon the jury's verdict, and these appeals ensued.

## I

Seringetti, in its first assignment of error, contends that the trial court erred in including in its charge to the jury six instructions submitted by the city regarding the construction of the contract between the city and Seringetti in the event that provisions of the contract were found by the jury to be ambiguous or inconsistent. Seringetti asserts in support of this remonstration that the instructions were premised upon federal cases construing federal regulations and that the rules of construction therein established do not reflect Ohio law. We agree.

### A

At the city's request and over Seringetti's objection, the court instructed the jury that:

"A person who knows of a problem or ambiguity with a bid document for a public construction project, but who fails to clear up the problem or ambiguity with the public authority, proceeds at its own risk and expense.

"The rule that all doubts about the meaning of a provision in a contract should be resolved against the party who drafted a contract does not apply where the contractor knew of the alleged ambiguity before it submitted its bid.

"Where there is knowledge on the part of the contractor of an obvious problem on the part of the City in its bid document, there is a duty on the contractor to inquire of the city as to the meaning of the bid document if the contractor intended to rely upon his interpretation in the future.

"One who intends to bid on a construction project with a public authority must inquire into obvious errors, omissions, or inconsistencies in provisions of the bid document even if the interpretation sought to be placed on those provisions by the contractor is conceivable.

"Where certain provisions of a contract would be rendered meaningless if the interpretation propounded by the contractor were adopted, the contractor assumes all risks of an incorrect interpretation in going ahead with its bid without consulting the proper authorities. In such a case, the contractor cannot rely on the principle that ambiguities are to be construed against the drafter of the document.

"The provisions of the contract must be read as a whole. A person may not rely on an interpretation of the specifications in a bid document which renders other portions of the specifications meaningless."

It is undisputed that the contract at issue was executed in Ohio. Therefore, Ohio law governs its interpretation. The city concedes that it can cite no Ohio case-law authority to support the rules of construction set forth in the disputed instructions, and we find that the instructions do not reflect Ohio law. We are precluded, however, from a finding of prejudice in the rendering of the instructions by our determination in response to the city's sole

assignment of error that the trial court erred in failing to direct a verdict in favor of the city at the close of Seringetti's case-in-chief. On that basis, we overrule Seringetti's first assignment of error.

## B

The contract between the city and Seringetti consisted of a bound volume of contractual provisions and a separate set of drawings with accompanying specifications in the form of notations. Seringetti asserted in its complaint and maintained throughout the course of the trial that the specifications and provisions of the contract with respect to builder's hardware, interior and exterior cleaning, and general contractor duties were ambiguous and that the city's imposition on Seringetti of additional obligations under these contractual provisions constituted extra work for which Seringetti was entitled to additional compensation. The city's primary defense to the allegations advanced by Seringetti was that the specifications and provisions of the contract were clear, that the contract was internally consistent and that Seringetti was contractually obligated to perform the work that it had in fact performed.[2] The trial court ruled that the issue of whether the contract was clear or ambiguous was for the jury and found that the evidence adduced at the proceedings below warranted instructions on the interpretation of the contract if its provisions were found to be clear and consistent and, in the alternative, on the construction of the contract if its language was found to be ambiguous or its provisions were found to be inconsistent. Thus, the court submitted the case to the jury under both theories.[3]

The interpretation of a written agreement is, in the first instance, a matter of law for the court. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St. 2d 241, 7 O.O. 3d 403, 374 N.E. 2d 146. If a contract is clear and unambiguous, the court need not concern itself with rules of construction or go beyond the plain language of the agreement to determine the rights and obligations of the parties. *Internatl. Assn. of Machinists & Aerospace Workers, Lodge No. 1194 v. Garwood Indus., Inc.* (N.D. Ohio 1973), 368 F. Supp. 357, reversed on other grounds *sub nom. Internatl. Assn. of Machinists & Aerospace Workers, Lodge No. 1194 v. Sargeant Indus., Inc.* (C.A. 6, 1975), 522 F. 2d 280; *Cleveland Trust Co. v. Snyder* (1978), 55 Ohio App. 2d 168, 9 O.O. 3d 329, 380 N.E. 2d 354. Instead, the court must give effect to the language of the contract, *Minnesota Mining & Mfg. Co. v. Blume* (S.D. Ohio 1978), 533 F. Supp. 493, affirmed (C.A. 6, 1982), 684 F. 2d 1166, certiorari denied (1983), 460 U.S. 1047 and 461 U.S. 939, and

---

[2] The city, in offering the disputed instructions, presented an alternative defense to the effect that, even if the material provisions of the contract could be deemed ambiguous or inconsistent, Seringetti was precluded from recovery for the extra work that it allegedly performed when it proceeded in reliance on its own interpretation of the provisions and failed to resolve any perceived ambiguities or inconsistencies with the city prior to submitting its bid or performing under the contract.

[3] The court instructed the jury of its own accord that:

"In general, words in a contract are given their plain and ordinary meaning according to our common usage in daily life.

"Words that have acquired particular meaning common to trade are normally given that meaning. You will decide by the greater weight of the evidence what the parties intended the words to mean, considering all the facts and circumstances in evidence, and in particular, the evidence about the use of it in the trade."

must convey its proper interpretation to the jury rather than allow the jury to adopt an erroneous view of the contract. *Scott* v. *Anchor Motor Freight, Inc.* (C.A. 6, 1973), 496 F. 2d 276, certiorari denied (1974), 419 U.S. 868, 997; *Getty* v. *Scholz Homes, Inc.* (1965), 2 Ohio App. 2d 331, 31 O.O. 2d 512, 208 N.E. 2d 552. Only when the provisions of a contract are ambiguous should the court submit the matter to the jury, with appropriate instructions, for a resolution of those ambiguities. *Clarke* v. *Hartley* (1982), 7 Ohio App. 3d 147, 7 OBR 190, 454 N.E. 2d 1322.

We find that the court below erred in submitting to the jury the issue of whether the disputed contractual provisions were clear or ambiguous. We further determine, upon our independent review of the contract and the record of the proceedings below, that the disputed contractual provisions were clear and unambiguous and that Seringetti was thereunder required to perform the work that it had performed.

### 1

Addressing first the issue of interior cleaning, we note that the general provisions for cleaning are set forth under section 01710 of the contract. Under subsection 3.03, which prescribes the requirements for final cleaning, Seringetti was instructed to:

"B. Remove grease, mastic, adhesives, dust, dirt, stains, fingerprints, labels, and other foreign materials from sight-exposed interior * * * surfaces. Polish glossy surfaces to a clear shine.

"C. Clean the entire interior of building including existing construction whether or not affected by remodeling work."

Notation 26 to drawing 2.4 required Seringetti to "[c]lean walls and base and floors at entry with detergent and stiff brush." Dean Frazier, the president of Seringetti, testified at trial that a more expensive, chemical-water-pressure method was employed to clean the entire interior of the building because the detergent-brush method recommended for cleaning the entry would not have thoroughly cleaned the surfaces.

The contract clearly required Seringetti to "[c]lean the entire interior of [the] building," but specified the detergent-brush cleaning method only for the entry to the building. Frazier admitted that he was not instructed by the city to restore the entry to its original appearance, and there is no evidence of record to suggest that the city would not have accepted the results of the detergent-brush cleaning method. Thus, we can only conclude that Seringetti unilaterally elected to use the more expensive chemical-water-pressure method to clean the entry. The contract left the method to be employed in cleaning the remainder of the interior unspecified and thus to the discretion of the contractor. Accordingly, it was incumbent upon Seringetti to make a pre-bid determination of the method to be employed in cleaning the remainder of the interior and to include an amount therefor in its bid.

Seringetti's assertion that it incurred extra work and expense in its use of the chemical-water-pressure method is to no avail. If the language of a contract is clear and unambiguous, it does not become ambiguous because, in its operation, it will work a hardship on one of the parties to the advantage of the other. *S & M Constructors, Inc.* v. *Columbus* (1982), 70 Ohio St. 2d 69, 24 O.O. 3d 145, 434 N.E. 2d 1349. We find that Seringetti's duties under the contract with respect to interior cleaning were clear, and that if Seringetti unilaterally chose to employ a more expensive cleaning method for the entry

in disregard of the method specified in the contract and, in its discretion, elected to employ that method throughout the interior, the city cannot be held accountable for any extra work or expense incurred.

### 2

Turning to the issue of exterior cleaning, we again refer to subsection 3.03 of section 01710, which sets forth the requirements for final cleaning. Seringetti was thereunder required to:

"B. Remove grease, mastic, adhesives, dust, dirt, stains, fingerprints, labels, and other foreign materials from sight-exposed * * * exterior surfaces * * *."

Notation 21 to drawing 3.1 further instructed Seringetti to "[c]lean all graffiti and dirt from brick (typical)." Finally, the contract prescribed the cleaning of exposed brick masonry under section 04200, subsection 3.08, part C, which provides in relevant part as follows:

"C. *Clean exposed brick masonry* surfaces by the bucket and brush hand cleaning method or by high pressure water method * * *.

"1. Use commercial cleaning agents in accordance with manufacturer's instructions.

"2. Do not use muriatic acid."

Frazier testified that he did not interpret the contract to require cleaning of the entire exterior of the building. He stated that, although the city had told him that restoration of the building's facade to its original appearance was not required, Seringetti cleaned the entire exterior of the building by the same chemical-water-pressure method employed on the interior because the city had plainly stated that, upon final inspection of the building, it would not accept the work if the removal of graffiti from the lower half of the exterior of the building resulted in variations in color.

Contrary to Frazier's proposed interpretation of the contractual provisions relevant to exterior cleaning, we find that the contract required Seringetti to clean the entire exterior of the building. We further find the chemical-water-pressure method employed by Seringetti to clean the exterior was within the contemplation of section 04200, subsection 3.08, part C. We, therefore, conclude on the issue of exterior cleaning that Seringetti was contractually required to perform the work that it had in fact performed.

### 3

With respect to the issue of builder's hardware, Frazier asserted at trial that the builder's hardware allowance under division 1, section 01020 of the contract was ambiguous. He complained that the provision appeared to limit Seringetti's bid submission for all builder's hardware to $3,000 when, in fact, the builder's hardware required for the project was well in excess of that amount, and when the city's actual and undisclosed intent was to set a limit of $3,000 on bid submissions for replacement builder's hardware. Frazier contended that, as a result of the ambiguity created by the city's undisclosed intent to limit bids only on replacement builder's hardware, Seringetti was misled into excluding from its bid an additional amount to cover costs for the balance of the builder's hardware.

Division 1 of the contract sets forth general requirements. Section 01020 of division 1 addresses the matter of allowances and provides under subsection 1.03, part A:

"1.03 *CASH ALLOWANCES:*

"A. *Hardware Allowance:* The General Contractor shall include the following sum for purchase of Builders Hardware under Section 08700: Three Thousand Dollars ($3,000.00)."

Division 8 of the contract pre-

scribes the requirements for doors and windows. Section 08700 of division 8 sets forth the general provisions for builder's hardware, and subsection 2.01 addresses specifically the hardware allowance, providing in part A as follows:

"2.01 *HARDWARE ALLOWANCE:*

"A. *Selection and Ordering:* Replacement builders hardware for existing doors will be selected by the Architect and shall be supplied for such amounts and by such persons as provided for under Allowances in Division 1 and other general provisions of the Contract."

Division 1, section 01020, subsection 1.03, establishes a $3,000 cash allowance for builder's hardware and refers the contractor to section 08700. Subsection 2.01 of section 08700 specifically addresses the hardware allowance, providing that *"[r]eplacement* builders hardware \* \* \* shall be supplied for such amounts \* \* \*.as provided for under Allowances in Division 1 \* \* \* of the Contract." (Emphasis added.)

Frazier's complaint that the general reference under the division 1, section 01020 allowance provision to section 08700 did not prompt a thorough reading of all provisions of section 08700 is feckless. When the parties to a written agreement have signed the agreement, a presumption arises that their minds met and a contract was made, even if one of the parties failed to read the agreement. *Hughes* v. *Cardinal Federal Savings & Loan Assn.* (S.D. Ohio 1983), 566 F. Supp. 834. We find that the two provisions, read together, clearly evince an intent on the part of the city to set a limit of $3,000 on bid submissions for replacement builder's hardware only and that the city cannot be held to account for any extra expense incurred by Seringetti resulting from its failure to read

and interpret the contract in its entirety.

4

Finally, with respect to the issue of general contractor duties, Frazier asserted at trial that Seringetti was a contractor for general construction, not a "general contractor" as he would define the term. He thus contended that Seringetti incurred extra work by virtue of the city's imposition on Seringetti of the duties of a general contractor as set forth under the contract.

Division 1, section 01010 of the contract provides a summary of the work to be performed on the project. Subsection 1.02, part C lists the four "branches" of work as "General Construction, Plumbing, HVAC and Electrical." Subsection 1.03, part A imposes on the "General Contractor" the duty to coordinate the work of the plumbing, HVAC and electrical branches as follows:

"1.03 *COORDINATION AND DIVISION OF RESPONSIBILITY:*

"A. The General Contractor shall schedule and coordinate work of all trades including Plumbing, HVAC, and Electrical subcontractors and shall coordinate work with the Owner as necessary to expedite the work."

Subsection 1.04 sets forth the requirements for preconstruction and progress meetings, providing:

"1.04 *MEETINGS:*

"A. Pre-Construction Conference: The Owner, Architect, General Contractor, and Plumbing, HVAC, and Electrical subcontractors and field foreman shall meet on the site immediately after award of contracts and before start of work to review the site and regulations and restrictions affecting the work.

"B. Progress Meetings: When directed by the Architect, meetings shall be held with affected parties to review progress and coordinate and

expedite the work. Representatives of parties required to attend shall be qualified and authorized to act on behalf of the parties they represent. The General Contractor shall keep minutes of such meetings and distribute copies to the Owner, Architect, subcontractors, and separate contractors."

The contract identifies only four "branches" of work. The "General Construction" branch is listed with the other branches of work, *viz.*, plumbing, HVAC and electrical, under subsection 1.02 of section 01010. However, in subsequent provisions of the contract, including subsections 1.03 and 1.04, which again list the other branches of work and which impose on the "General Contractor" the duty to coordinate the work of all trades and to keep the minutes of progress meetings, reference to a general construction contractor or a contractor for general construction is conspicuously absent.

Further, as we noted in our discussion on the issue of builder's hardware, Seringetti asserted in the proceedings below that it was misled under subsection 1.03 of section 01020 into underbidding on builder's hardware. Subsection 1.03 of section 01020 is directly addressed to the "General Contractor." To accept Seringetti's assertion, necessary to its claim on the issue of builder's hardware, that it was a general contractor for purposes of the section 01020, subsection 1.03 allowance, but not for purposes of the duties of the general contractor mandated under section 01010, would do violence to the plain meaning of the language of the contract.

We find no ambiguity in the contractual provisions relevant to the issue of general contractor duties. We hold that Seringetti was the "General Contractor" as that term was employed in the contract, and that Ser-

ingetti was thereunder required to coordinate the work of the trades and to keep the minutes of the progress meetings.

Upon our determination that the language of the contract was clear and unambiguous and that Seringetti was thereunder required to perform the work that it had performed, we hold that the trial court erred in failing to direct a verdict in favor of the city at the close of Seringetti's case-in-chief. Accordingly, we sustain the city's sole assignment of error.

II

Seringetti, in its second assignment of error, contends that the trial court erred in excluding its offer into evidence of the city's third-party complaint against Glaser & Myers and answers to interrogatories propounded by Glaser & Myers and in precluding Seringetti from inquiring of a witness for the city as to the allegations advanced by the city in its third-party complaint. In its third assignment of error, Seringetti contests the trial court's denial of its post-trial motion for a new trial when the jury failed to heed the trial court's charge that the special interrogatories submitted by the city were to be completed only if a verdict was returned for Seringetti. In its fourth and final assignment of error, Seringetti contends that the trial court erred in compelling the jury to resume deliberations without responding to the jury's request for further instructions. Having determined in response to the city's sole assignment of error that the city was entitled to a directed verdict in its favor at the close of Seringetti's case, we confine our consideration of Seringetti's remaining assignments of error to the challenge presented under the second assignment of error to the trial court's exclusion of evidence offered in the course of Seringetti's case-in-chief.

As we noted *supra,* the city filed, in response to Seringetti's complaint, an answer and a third-party complaint against Glaser & Myers. In October 1984, prior to trial on the issues advanced by Seringetti, the third-party complaint against Glaser & Myers was voluntarily dismissed. At the close of its case-in-chief, Seringetti offered into evidence plaintiff's Exhibit 20, the city's answers to interrogatories propounded by Glaser & Myers prior to dismissal, and plaintiff's Exhibit 21, the city's third-party complaint against Glaser & Myers. Neither exhibit was authenticated by a witness during Seringetti's case-in-chief.

The Supreme Court of Ohio in *Steinle* v. *Cincinnati* (1944), 142 Ohio St. 550, 27 O.O. 488, 53 N.E. 2d 800, held that proof of a writing's execution and authenticity is required as a condition precedent to its admission into evidence. *Id.* at 556, 27 O.O. at 490, 53 N.E. 2d at 803. Article IX of the Ohio Rules of Evidence governs authentication and identification. Evid. R. 901(A) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims," and Evid. R. 901(B) sets forth a nonexclusive list of examples to illustrate "authentication or identification conforming with the requirements of this rule." Evid. R. 902, which governs self-authentication, sets forth a list of exceptions to the requirement of authentication by extrinsic proof, providing in relevant part that, under certain conditions, "[e]xtrinsic evidence of authenticity * * * is not required with respect to [*inter alia*] * * *: (1) Domestic public documents under seal * * * (2) Domestic public documents not under seal * * * (3) Foreign public documents * * * [and] (4) Certified copies of public records * * *."

With respect to plaintiff's Exhibit 20, the city's answers to Glaser & Myers's interrogatories, we find that unfiled answers to interrogatories are not among the documents listed under Evid. R. 902 as self-authenticating and that Seringetti, in its offer of the exhibit, presented no extrinsic proof as to its authenticity. See, *e.g.,* Evid. R. 901(B)(1). Thus, we conclude that Seringetti's failure to satisfy the foundational condition precedent to the introduction into evidence of plaintiff's Exhibit 20 rendered the exhibit inadmissible at trial.

Turning to plaintiff's Exhibit 21, the city's third-party complaint against Glaser & Myers, we find that it may properly be characterized for purposes of Article IX of the Ohio Rules of Evidence as a "public record," *i.e.,* "a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office." Evid. R. 901(B)(7); see, also, Evid. R. 902(4). "The requirement of authentication or identification as a condition to admissibility is satisfied," Evid. R. 901(A), with respect to a public record upon extrinsic evidence that the writing "is from the public office where items of this nature are kept." Evid. R. 901(B)(7). Again, as with plaintiff's Exhibit 20, Seringetti, in its offer of plaintiff's Exhibit 21, presented no extrinsic proof to satisfy the requirement of authentication. Thus, plaintiff's Exhibit 21 was inadmissible under Evid. R. 901(B)(7). Evid. R. 902(4) provides in relevant part that a public record is self-authenticating if it has been "certified as correct by the custodian or other person authorized to make the certification, by certificate complying with paragraph (1), (2), or (3) of this rule or complying with any law of a jurisdiction, state or federal, or rule prescribed by the Supreme Court of Ohio." Plaintiff's Exhibit 21, as offered into evidence by Seringetti,

bears no certification which would render it admissible as a self-authenticating document under Evid. R. 904(4). We, therefore, conclude that neither plaintiff's Exhibit 20 nor plaintiff's Exhibit 21, as offered by Seringetti, was admissible in the proceedings below and, accordingly, we overrule Seringetti's second assignment of error.

Upon our determination that the trial court properly excluded plaintiff's Exhibits 20 and 21 and should have directed a verdict in favor of the city at the close of Seringetti's case, we affirm the entry of judgment against Seringetti in the court below.

*Judgment affirmed.*

SHANNON, P.J., DOAN and HILDEBRANDT, JJ., concur.