ALTERNATIVES UNLIMITED–SPECIAL, INC. et al., Appellants,

v.

OHIO DEPARTMENT OF EDUCATION, Appellee.

[Cite as *Alternatives Unlimited–Special, Inc. v. Ohio Dept. of Edn.*, 168 Ohio App.3d 592, 2006-Ohio-4779.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 05AP–1098.

Decided Sept. 14, 2006.

594

Bricker & Eckler L.L.P., Luther L. Liggett Jr., and Gregory T. Parks; Roetzel & Andress, Sharon K. Cason–Adams and Robert B. Graziano, for appellants.

Jim Petro, Attorney General, Susan M. Sullivan, and Mindy Worly, Assistant Attorneys General, for appellee.

TRAVIS, Judge.

{¶ 1} This is an appeal from the September 15, 2005 decision of the Ohio Court of Claims. The court entered judgment in favor of appellee, the Ohio Department of Education ("ODE"). Appellants, Alternatives Unlimited, Inc. ("AU–Inc.") and Alternatives Unlimited–Special, Inc. ("AU–Special"), challenge the court's conclusion that appellants lack standing to bring suit. For the reasons that follow, we reverse the decision of the trial court and remand this cause for further consideration.

{¶ 2} This case involves the creation and funding of a community school under R.C. Chapter 3314. A community school is a privately governed public school, considered part of the state's program of education but independent of any school district. R.C. 3314.01. A community school is funded by state revenues pursuant to a complex calculation set forth in R.C. 3314.08. Under R.C. 3314.01, "[a]ny person or group of individuals may propose the creation of a community school." Once created, a community school may sue and be sued, acquire facilities, contract for services, and enter into contracts with its sponsor under R.C. Chapter 3314.

{¶ 3} Although considered an independently administered entity, each community school must have a public sponsor. R.C. 3314.02(A)(1). The person or group of individuals may choose to present the community-school proposal to any sponsor identified in R.C. 3314.02(C)(1), such as the board of education of the city or school district in which the proposed school will be located or the state board of education. In turn, the chosen sponsor may enter into a preliminary agreement pursuant to R.C. 3314.02(C)(2), indicating its intention to sponsor the community school.

{¶ 4} Once a preliminary agreement is reached, the proposing individual or group "may proceed to finalize plans for the school, establish a governing authority * * * for the school, and negotiate a contract with the [sponsor]." R.C. 3314.02(C)(2).[1] If the proposing person or group of individuals abides by the preliminary agreement and all applicable statutory provisions, the sponsor must enter into good-faith negotiations and execute a contract in accordance with R.C. 3314.03. Id. "A majority vote of a sponsoring [school district board] and a

---

1. At the time the contract disputed herein was executed, R.C. Chapter 3314 contained no definition for the term "governing authority." However, amendments effective September 26, 2003, created R.C. 3314.02(E), which states, "Each new start-up community school established under this chapter shall be under the direction of a governing authority which shall consist of a board of not less than five individuals who are not owners or employees, or immediate relatives of owners or employees, of any for-profit firm that operates or manages a school for the governing authority."

majority vote of the members of the governing authority of a community school shall be required to adopt a contract and * * * establish the new start-up school." R.C. 3314.02(D).

{¶ 5} Pursuant to R.C. 3314.03, each contract entered into under R.C. 3314.02 between a sponsor and the governing authority of a community school must specify certain terms and conditions, such as the educational program, academic goals, performance and administration standards, dismissal procedures, arrangements for providing health benefits to employees, and procedures for resolving disputes between the sponsor and the governing authority of the school. R.C. 3314.03(A). The contract must also specify that "the school shall be established as * * * [a] nonprofit corporation established under Chapter 1702. of the Revised Code." R.C. 3314.03(A)(1)(a). Furthermore, the contract must identify "[t]he governing authority of the school, which shall be responsible for carrying out the provisions of the contract." R.C. 3314.03(A)(14).

{¶ 6} In light of these statutory requirements, we turn to the facts of the case before us. AU–Inc. is a for-profit Maryland corporation that was formed by three people, one of whom is Stuart Berger. According to Mr. Berger, AU–Inc. was established to educate at-risk children. Mr. Berger testified that AU–Inc. was interested in partnering with the Cleveland Public Schools to open a community school in Ohio; however, "it was very clear the only way that could be done was to have a not-for-profit corporation."

{¶ 7} Thus, on February 19, 1999, Stuart Berger, Jackie Peters, and Roger J. Kalbrunner created AU–Special as a nonprofit corporation pursuant to R.C. Chapter 1702. As set forth in the articles of incorporation, the purpose of AU–Special was to "advance education by promoting, establishing, and operating alternative school programs and learning opportunities, including classroom instruction and individual courses of study." The three incorporators were listed as the trustees of the corporation "until the first annual meeting or other meeting called to elect trustees." The articles of incorporation make no reference to a "governing authority." In fact, there is no indication within the record regarding whether a governing authority was ever officially created or, if it was, who the governing authority's members were.

{¶ 8} Approximately one month before AU–Special was formally incorporated, representatives from AU–Special faxed the ODE a proposal to create a community school, the Cleveland Alternative Learning Academy ("CALA").[2] The proposal identified Stuart Berger, Nicholas C. Spinnato Sr., Terrence Shelton, and

---

2. Pursuant to R.C. 3301.13, ODE is the administrative agency "through which the policies, directives, and powers of the state board of education and the duties of the superintendent of public instruction are administered."

Elijah Scott as the principal developers of CALA. In addition to the principal developers, the proposal specified that it would utilize the expertise of Douglas Riley, Jackie Peters, Diana Cubbage, Bobby Durrah, and Intellectual Development Systems during the formation of CALA. Again, there is no mention of a governing authority. Over the next several months, representatives of AU–Special and ODE continued to negotiate towards CALA's establishment.

{¶ 9} Eventually, the state board of education, through ODE, agreed to sponsor CALA. Accordingly, ODE executed a five-year contract beginning September 1, 1999 and ending June 30, 2004, entitled the "Ohio State Board of Education Community School Contract—Cleveland Alternative Learning Academy." Susan Tave Zelman, as the Superintendent of Public Instruction, executed the contract on behalf of the State Board of Education on September 1, 1999. Elijah Scott and David Smith had previously signed the contract, under the heading "THE GOVERNING AUTHORITY OF CLEVELAND ALTERNATIVE LEARNING ACADEMY," on August 9, 1999. No other individual signed the contract, whether in a personal or corporate capacity.

{¶ 10} At the onset of the 1999–2000 school year, CALA opened its doors to students enrolled in grades three, four, five, and six. However, parents of enrolled and prospective students expressed a desire to have all of their younger school-aged children attend the same school. CALA responded by increasing their educational offerings and enrolling children in grades two, seven, and eight. On October 18, 1999, Nicholas Spinnato wrote a letter to Joni Cunningham at ODE, requesting approval of the expanded enrollment.[3]

{¶ 11} Without waiting for approval, CALA educated students in grades two through eight for the 1999–2000 and 2000–2001 academic years. According to appellants, ODE refused to modify the contract—and thus provide funds for students in the additional grades—until the appropriate resolution, as well as updated records and curriculum goals, was submitted to ODE. Appellants contend that they made every effort to comply with ODE's requests, but were met with changed and increased expectations. In the end, the contract was never modified.

{¶ 12} In addition to the modification problems, appellants and ODE were quickly at odds over funding for CALA. Initial funding for community schools is based on the school's preopening enrollment estimates. CALA had a predicted enrollment of 200 students. However, the actual enrollment at CALA fell well

---

3. Nicholas Spinnato signed the letter as Alternatives Unlimited's Executive Vice President of Operations. A recurring problem in this case is appellants' failure to distinguish between the two separate entities—AU-Inc. and AU–Special—and, instead, referring to them merely as Alternatives Unlimited or "AU."

below the estimated figure, resulting in overpayment of funds. Consequently, ODE established a repayment schedule and began to recoup those funds from the monthly allocation of payments from the state throughout the 2000–2001 school year. In addition to instituting the repayment plan, ODE did not remit funds for students in the added grades, for which approval had still not been granted. According to appellants, ODE's refusal to pay for students in grades two, seven, and eight, combined with an alleged overly aggressive recoupment strategy, resulted in severe financial hardship approaching bankruptcy.

{¶ 13} Eventually, relations between appellants and ODE worsened to a critical point. Infighting and miscommunication within the managing structure of CALA, AU–Inc., AU–Special, and ODE led to the need to determine exactly who had authority to act on behalf of CALA under the community-school contract. In early April 2001, representatives of ODE determined that David Smith and Elijah Scott, the original signatories to the contract, were the legal representatives of CALA pursuant to the operating contract.

{¶ 14} Subsequently, ODE officially recognized Smith and Scott as the governing authority of CALA. On August 1, 2001, Smith and Scott wrote to Susan T. Zelman, Superintendent of Public Instruction, requesting that the State Board of Education rescind the CALA contract immediately. On August 24, 2001, Mathew DeTemple, Chief Legal Counsel for ODE, wrote Stuart Berger:

Please be advised that the community school known as the Cleveland Alternative Learning Academy no longer has the authority to operate as a community school pursuant to Chapter 3314 of the Ohio Revised Code. The governing authority members of the school, Elijah Scott and David Smith, rescinded the contract with the Sponsor, State Board of Education, effective August 1, 2001.

Appellants, through an August 29, 2001 letter written by Stuart Berger, denied the effectiveness of the rescission, stating:

You know full well that a contract exists between the Ohio Department of Education and the Cleveland Alternative Learning Academy Board, a board you have acknowledged on numerous occasions. Therefore, Cleveland Alternative Learning Academy will continue to operate as the authorized community school that it is.

Indeed, CALA began operation at the beginning of the 2001–2002 academic year, but quickly closed without funding from the state.

{¶ 15} On May 7, 2002, appellants filed suit against ODE in the Ohio Court of Claims. Appellants asserted two claims for breach of contract. Appellants sought a declaratory judgment and monetary damages for ODE's failure "to pay for all of the students actually enrolled and taught" at CALA, as well as the

alleged invalid, unilateral "rescission" of the contract. Alternatively, appellants sought judgment on the bases of promissory estoppel and unjust enrichment.

{¶ 16} ODE filed an answer generally denying any liability. ODE took the position that ODE owed no obligation to provide funding for students improperly enrolled in grades two through eight and that Smith and Scott were entitled to rescind the contract as the governing authority. Moreover, ODE asserted that appellants lacked standing to bring suit on the contract.

{¶ 17} After addressing several motions for summary judgment, the issues of liability and damages were bifurcated, and the case proceeded to trial regarding liability only on July 12, 2004.[4] On September 15, 2005, the trial court issued its judgment. The court concluded that neither AU–Special nor AU–Inc. were parties to the contract or intended third-party beneficiaries and, thus, lacked standing to pursue their claims for breach. Accordingly, the trial court entered judgment in favor of ODE. Appellants filed a notice of appeal on October 12, 2005.

{¶ 18} Appellants raise two assignments of error:

First Assignment of Error: The trial court erred by concluding that the State may deny per-pupil public funding for students at a community school.

Second Assignment of Error: The trial court erred by concluding that the statutorily-required non-profit corporation is not a party to a community school contract.

Appellants' second assignment of error addresses the trial court's conclusion that neither AU–Inc. nor AU–Special has standing to bring suit for breach of the community-school contract. Because the issue of standing is a threshold requirement to the propriety of this case, we shall address it first.

{¶ 19} Pursuant to Civ.R. 17, a civil action must be prosecuted by the real party in interest. *State ex rel. Dallman v. Franklin Cty. Court of Common Pleas* (1973), 35 Ohio St.2d 176, 178, 64 O.O.2d 103, 298 N.E.2d 515. Unless a party has some real interest in the subject matter of the action, that party will lack standing to invoke the jurisdiction of the court. *SWA, Inc. v. Straka,* Cuyahoga App. No. 82103, 2003-Ohio-3259, 2003 WL 21434637, at ¶ 12. "The real party in interest is generally considered to be that person who can discharge the claim on which suit is brought * * * [or] is the party who, by substantive law, possesses the right to be enforced." *In re Highland Holiday Subdivision* (1971), 27 Ohio App.2d 237, 240, 56 O.O.2d 404, 273 N.E.2d 903. In a breach-of-contract claim, only a party to the contract or an intended third-party beneficiary of the

---

4. Although the case was originally tried before the Honorable Everett Burton beginning June 3, 2003, Judge Burton passed away before rendering judgment. Thus, the case was reassigned and tried again.

contract may bring an action on a contract in Ohio. *Grant Thornton v. Windsor House, Inc.* (1991), 57 Ohio St.3d 158, 161, 566 N.E.2d 1220.

{¶ 20} We turn to the contract to discern the parties' identities. The construction of a written contract is a matter of law. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. In construing a contract, the court's primary objective is to ascertain and give effect to the intent of the parties. *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.* (1999), 86 Ohio St.3d 270, 714 N.E.2d 898. "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus. When the terms of the contract are clear and unambiguous, a court may not in effect create a new contract by finding an intent not expressed by the parties in the clear language used within the contract. *Alexander* at 246, 7 O.O.3d 403, 374 N.E.2d 146.

{¶ 21} Here, the first paragraph of the contract states:

This contract is entered into * * * by and between the Ohio State Board of Education and the Board of Directors of the Cleveland Alternative Learning Academy Community School * * *.

Without further inquiry, it appears that the Ohio State Board of Education and the CALA Board of Directors are the parties to the contract. However, the next paragraph reads:

The names and addresses of the individuals who act as the governing authority of the Cleveland Alternative Learning Academy Community School, and who are responsible for carrying out the provisions of this contract are listed as follows:

Elijah M. Scott [with his personal address]

David L. Smith [and his personal address].

In addition to being identified as the governing authority in the second paragraph of the contract, Elijah Scott and David Smith also executed the agreement as:

THE GOVERNING AUTHORITY OF CLEVELAND ALTERNATIVE LEARNING ACADEMY COMMUNITY SCHOOL

BY: /s/ Elijah Scott

/s/ David Smith

DATE: 8-9-99

The contract is the first document of record identifying Scott and Smith as the governing authority.[5]

---

5. Indeed, as previously noted, there is nothing in the record, save the contract itself, suggesting whether a governing authority was actually created, how it was created, or by whom. Nor does the contract itself explain how the governing authority came to exist.

{¶ 22} While at least one court has found that a disparity between the party identified in the granting clause of the contract and the parties who actually affix their signatures to the contract creates an ambiguity on the face of the contract,[6] we believe that the better course of action is to peruse the contract as a whole to ascertain whether the entirety of the contract resolves the apparent ambiguity. We further believe that this approach better corresponds with well-established concepts of contract interpretation. Specifically, a court should give effect to every provision contained within a contract unless to do so results in absurdity. Thus, a contractual provision that would be ambiguous if considered alone is not ambiguous if it cross-references another provision within the contract resolving the ambiguity. *Seringetti Constr. Co. v. Cincinnati* (1988), 51 Ohio App.3d 1, 553 N.E.2d 1371. Additionally, if one construction of a questioned provision would make that provision meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must prevail. *Farmers' Natl. Bank v. Delaware Ins. Co.* (1911), 83 Ohio St. 309, 94 N.E. 834, paragraph six of the syllabus. Accordingly, the entire contract must be read as a whole before it is declared ambiguous.

{¶ 23} Continuing, the next paragraph of the contract states:

This contract is entered into pursuant to the provisions of Chapter 3314. of the Ohio Revised Code whereby the State Board of Education, hereinafter termed the "SPONSOR" agrees to sponsor the Cleveland Alternative Learning Academy Community School as established by the Governing Authority of Cleveland Alternative Learning Academy Community School, hereinafter termed "GOVERNING AUTHORITY."

The next section, entitled "Article I. Purpose," provides:

This contract is established pursuant to Chapter 3314. of the Ohio Revised Code and specifically section 3314.03 of the Revised Code for the purpose of establishing a new start-up school in the Cleveland City School District. Upon the signature of all parties and as set forth below, a new community school shall be created. * * * Pursuant to Ohio Revised Code section 3314.01, the new community school may sue and be sued, acquire facilities as needed and contract for services necessary for the operation of the school. The GOVERNING AUTHORITY of the new community school may carry out any act and ensure the performance of any function that is in compliance with the Ohio Constitution, Ohio Revised Code Chapter 3314., other statutes applicable to community schools and the terms of this contract as set forth below.

---

**6.** In *Wallington v. Red–E–Bilt Prods., Inc.* (Jan. 13, 1987), Richland App. No. CA 2423, 1987 WL 4727, the Fifth District Court of Appeals noted that when the granting clause of a commercial lease identifies a corporate entity as tenant, but it is executed by individuals without indication of corporate capacity, the document is ambiguous on its face.

{¶ 24} These contractual provisions place all apparent power and authority to operate the community school and/or act on its behalf with the aptly named "governing authority." The members of the governing authority are explicitly identified as Elijah Scott and David Smith, both within the second paragraph and by the language prefacing Scott and Smith's execution of the contract as the governing authority. Additionally, Article I specifies that the new community school shall be created upon the signature of the parties, identified as the State Board of Education and the Governing Authority of CALA.

{¶ 25} Despite the terminology of the contract's opening paragraph, naming the "Board of Directors of [CALA]," the remaining language of the contract clearly designates the governing authority of CALA as the operative party. In addition to the above sections, the contract grants the governing authority the power and responsibility to act on behalf of CALA. For example, Article II states:

> This contract shall be binding upon both parties upon receipt by the GOVERN-ING AUTHORITY of a fully executed copy of the contract.

Additionally, Article III, "Responsibilities of the Governing Authority," provides:

> The GOVERNING AUTHORITY has established the Alternatives Unlimited–Special as a nonprofit corporation established under Chapter 1702. of the Revised Code.

Article III continues to invest various responsibilities of operating CALA with the governing authority, including procurement of liability insurance for any potential liability of CALA, compliance with multiple sections of the Ohio Revised Code, and requesting criminal record checks for potential employees. Article III also sets forth the governing authority's responsibilities in the realms of the educational program, financial plan, governance and administrative plan, and assessment and accountability plan.

{¶ 26} Articles VI and VII are also of considerable interest to this discussion. Article VI, entitled Assignment, states:

> Neither this agreement nor any rights, duties or obligations described herein shall be assigned by any party hereto without prior written consent of the SPONSOR and the GOVERNING AUTHORITY.

Meanwhile, Article VII, "Changes or Modifications," provides:

> This agreement constitutes the entire agreement among the parties and any changes or modifications of this agreement shall be made and agreed to in writing.

{¶ 27} Noticeably lacking in the aforementioned contractual language is any further reference to CALA's board of directors. Indeed, that board is mentioned

specifically only one other time—in the attached "Exhibit III: Governance and Administrative Plan." [7] Subsection A of that exhibit states:

> There will be a seven member Board of Directors of the Cleveland Alternative Learning Academy. The group will include two representatives of [AU–Special], a Cleveland educator, a Cleveland businessperson, a Cleveland Attorney, and two parents chosen by the parents. * * *
>
> [AU–Special's] appointees will be made by its Board as will the attorney. * * *
>
> All board members will serve for three year staggered terms except the parents, who will serve one year terms. Board members may be removed by a majority vote of the entire board. * * *

Thus, the only other significant mention of the board is an announcement of its formation and the members' terms of service.

{¶ 28} Furthermore, because the community school and the contract that establishes it are legislative creations, we must construe the contract in light of R.C. Chapter 3314. Much of the contract itself is taken from, or mirrors, the statutory provisions. For example, that portion of Article I granting the governing authority the ability to "carry out any act and ensure the performance of any function" is taken verbatim from R.C. 3314.01(B). Similarly, the contract's organization is adopted from the requirements of R.C. 3314.03, as discussed above. In fact, the contract specifies that the governing authority established AU–Special as a nonprofit corporation established under R.C. Chapter 1702 and specifies that the governing authority is responsible for carrying out the provision of the contract. See R.C. 3314.03(A)(1) and 3314.03(A)(14).

{¶ 29} Comparing the language of the contract with that of the applicable statutory provisions, it becomes apparent that both consider the "governing authority" to be the contracting party, and thus the real party in interest. The statute prominently states that community school contracts entered into under R.C. 3314.02 are between a sponsor and the governing authority of a community school. R.C. 3314.03(A). Both also share the unfortunate propensity to use the terms "board" and "authority" synonymously; the contract using "by and between [ODE] and the Board of Directors of [CALA]" and the statute speaking to "the school's governing board." [8]

---

7. Exhibit No. II provides that the "Finance Committee will be responsible for reporting to the Board." One might assume that this is another reference to the CALA Board of Directors, but there is no specific designation.

8. R.C. 3314.03(A)(11)(e) states that nothing in R.C. Chapter 102 "shall prohibit a member of the school's governing board from also being an employee of the school."

{¶ 30} To conclude that the contract and/or the statute indicate two separate entities, rather than using the terms as equivalents, leads to a nonsensical conclusion: that the contract is between the state and the Board of CALA, but no representative of the CALA Board need execute the contract. Thus, we must reach the same conclusion as the trial court: the governing authority of CALA is the proper party to the contract.

{¶ 31} Appellants strongly contest this conclusion and assign error to the trial court's finding that neither the contractual nor the statutory language defines any role for the nonprofit corporation, AU–Special, or identifies it as a party to the contract. In support of their argument, appellants point to the statutory requirement that the school be established as a nonprofit corporation under R.C. Chapter 1702 and the contract's recitation that the governing authority established AU–Special as a nonprofit corporation under the same chapter. Appellants contend that AU–Special, for all intents and purposes, is CALA and vice versa. However, even if we were to accept appellants' position that AU–Special is CALA—in that AU–Special is merely doing business as CALA—we still do not find that AU–Special is actually identified as a party to the contract within the document itself.

{¶ 32} Contrary to AU–Special's arguments, its board of directors cannot be one and the same as the board of directors of CALA, as the board of one is specifically directed to appoint two members to the board of the other. While CALA and AU–Special may theoretically be one and the same, in reality they were established and operated as two separate and distinct entities, neither of which is identified as an actor under the contract.

{¶ 33} Appellants also argue that Scott and Smith signed the contract on behalf of AU–Special under the order of Stuart Berger. In this regard, appellants assert that the two individuals listed as members of the governing authority had no real authority to act on behalf of CALA or AU–Special; instead, they were mere agents of the real party in interest, AU–Special. However, the face of the contract directly contradicts this argument.

{¶ 34} There is no indication that Elijah Scott or David Smith signed in any capacity other than as the legitimate governing authority of CALA. The two men are explicitly identified as members of the governing authority and signed under that name. There are no indicia of agency, no "as a representative of AU–Special" or "on behalf of AU–Special" language. Furthermore, R.C. 3314.071 states:

> Any contract entered into by the governing authority or any officer or director of a community school, including the contract required by sections 3314.02 and 3314.03 of the Revised Code, is deemed to be entered into by such individuals in their official capacities as representatives of the community school.

The language of the statute is clear: Scott and Smith are deemed to have entered into the contract in their official capacities as representatives of the community school. Having already established that AU–Special and CALA were operated as distinct entities, regardless of their theoretical equivalence, it is only logical to conclude that Scott and Smith signed as representatives of CALA, as its governing authority, and not on behalf of AU–Special or AU–Inc.

{¶ 35} Based on the foregoing analysis, if the issue of the identity of CALA's governing authority—as indicated by the language of the contract alone—was the only one before us, we would affirm the judgment of the trial court. However, appellants also assert that the state was estopped from arguing that AU–Special was not the governing authority of CALA after that exact issue was judicially determined in *Birinyi v. School Employees Retirement Sys.* (Oct. 25, 2002), Cuyahoga C.P. No. 448544. *Birinyi* was an action brought to determine what employer entity was responsible for paying into Ohio's State Teachers Retirement System ("STRS") and the School Employees Retirement System ("SERS"). *Birinyi* was decided five months after appellants initiated the proceedings below, but well before the Court of Claims entered judgment.

{¶ 36} In *Birinyi*, AU–Inc. and AU–Special entered into a consent judgment in which the state of Ohio recognized "AU" as the governing authority of CALA.[9] Appellants state that the parties to both *Birinyi* and this case are the same: appellants and the state of Ohio. Therefore, appellants reason that having agreed in one judicial proceeding that "AU" is the governing authority of CALA, the state cannot change its position and claim the opposite.

{¶ 37} Appellants' arguments are based on the theories of judicial estoppel and estoppel by judgment. The former principle encompasses the notion that "a party cannot be permitted to occupy inconsistent positions or to take a position in regard to a matter which is directly contrary to or inconsistent with one previously assumed by him." *Van Dyne v. Fidelity–Phenix Ins. Co.* (1969), 17 Ohio App.2d 116, 46 O.O.2d 160, 244 N.E.2d 752. The latter theory, estoppel by judgment, is perhaps better known as one of the two concepts included in the doctrine of res judicata—claim preclusion. *Grava v. Parkman Twp.* (1995), 73 Ohio St.3d 379, 381, 653 N.E.2d 226. This theory stands for the proposition that "[a] valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or

---

**9.** In *Birinyi*, AU–Inc. and AU–Special were referred to collectively as "AU." Again, this court finds this to be a troubling misnomer, because the two corporations are far from being one and the same. AU–Inc. is a for-profit, foreign corporation, whereas AU–Special is an Ohio nonprofit corporation.

occurrence that was the subject matter of the previous action." Id. at paragraph one of the syllabus.

{¶ 38} Though not specifically argued by appellants, claim preclusion's counterpart, issue preclusion, or collateral estoppel, bars relitigation of an issue or fact where that issue or fact was fully and fairly determined in a prior action. An "issue or a fact that was fairly, fully, and necessarily litigated and determined in a prior action may not be [questioned] in a subsequent action between the same parties or their privies," whether or not the cause of action in the two actions are identical. *Nye v. Ohio Bd. of Examiners of Architects*, 165 Ohio App.3d 502, 2006-Ohio-948, 847 N.E.2d 46, at ¶ 13. In other words, material facts judicially determined by a court of competent jurisdiction are barred from relitigation between the same parties or persons in privity with them. *Goodson v. McDonough Power Equip., Inc.* (1983), 2 Ohio St.3d 193, 195, 2 OBR 732, 443 N.E.2d 978. Inherent to both issue and claim preclusion is the concept that a previously litigated and judicially determined fact or claim only acts as a bar to subsequent litigation between the same parties or their privies. This concept is referred to as mutuality and is generally a prerequisite to estoppel. Id. at 196, 2 OBR 732, 443 N.E.2d 978. With few exceptions, strangers to the previous judgment or decree will not be affected by the previous adjudication, and the doctrine of estoppel is irrelevant. Id.

{¶ 39} In addition to mutuality, the application of collateral estoppel demands that the fact or issue in dispute was actually and directly litigated in the prior action. Moreover, the fact or issue must have been passed upon and determined by a court of competent jurisdiction. *Nye*, at ¶ 13, citing *State ex rel. Stacy v. Batavia Local School Dist. Bd. of Edn.*, 97 Ohio St.3d 269, 2002-Ohio-6322, 779 N.E.2d 216, at ¶ 16. To determine whether these qualifications are met in this case, we must review the facts and circumstances of the prior action in light of the case at hand.

{¶ 40} In *Birinyi*, supra, Bettse Kay Birinyi, as plaintiff, along with SERS and STRS as third-party plaintiffs, brought suit against AU–Inc. and AU–Special (collectively referred to as "AU"). From what documentation is in the record, it appears that Birinyi, as well as approximately 13 other former teachers employed by CALA, sued for all of their STRS and/or SERS employee and employer pension contributions due and owing to them for their terms of service. On October 14, 2002, a judge of the Cuyahoga County Court of Common Pleas signed a consent judgment entry, by which all parties entered their "consent to judgment being entered against Defendant Alternatives Unlimited, Inc., pursuant to the terms stated and incorporated * * * by reference in the attached Settlement Agreement and Release."

{¶ 41} Within the Settlement Agreement and Release, all parties agreed:

Plaintiffs all were employees at CALA, a charter school under the laws of the State of Ohio, R.C. 3314. Because * * * STRS or SERS is a party hereto, the Attorney General, on behalf of STRS and SERS has reviewed and approved the settlement and this Agreement. The Attorney General approves the terms as stated and recognizes AU as the governing authority of CALA and the party responsible for making payments to STRS and SERS.

The consent judgment entry and settlement agreement and release are both executed by an assistant attorney general on behalf of the Ohio Attorney General. Thus, appellants assert that the issue of the identity of CALA's governing authority, AU, has already been determined by a court of competent jurisdiction and cannot be relitigated.

{¶ 42} The primary issue to be determined before applying the doctrine of collateral estoppel here is whether the requirement of mutuality is present in *Birinyi* and the present case. Appellants argue that regardless of which agency or official is acting on its behalf, the state of Ohio was a party to *Birinyi* and is a party to the instant case. Therefore, they assert that the requirement of mutuality is satisfied.

{¶ 43} The state maintains that the parties to the two lawsuits are not the same. To the contrary, the state argues that, in *Birinyi*, the parties were former CALA employees, STRS and SERS versus appellants, while here, the parties are appellants versus the ODE. Thus, the state asserts that *Birinyi* is irrelevant to the current proceedings.

{¶ 44} Appellants rely on *Ohio Dept. of Human Servs. v. Ohio Dept. of Transp.* (1992), 78 Ohio App.3d 658, 605 N.E.2d 1007, in support of their theory that regardless of whether STRS, SERS or ODE is involved, the state of Ohio is the actual party. In the *Ohio Dept. of Human Servs.* case, this court observed:

R.C. 2743.01(A) defines "state" as:

[T]he state of Ohio, including, without limitation, its departments, boards, offices, commissions, agencies, institutions, and other instrumentalities.

Id. at 660, 605 N.E.2d 1007. Therefore, we concluded that "all the parties to this action [various departments of the state] are members of the 'state' as defined in R.C. 2743.01(A) and are not distinct for purposes of R.C. Chapter 2743." Id. at 661, 605 N.E.2d 1007.

{¶ 45} Drawing on our conclusion in *Ohio Dept. of Human Servs.*, appellants contend that the ODE is equivalent to SERS or STRS—both being departments or instrumentalities of the state—and is bound by the Cuyahoga County litigation. Under the definition set forth under the Court of Claims Act, ODE is unquestionably a department of the state. Likewise, STRS has been deemed "an instrumentality of the state" and not a political subdivision, which is expressly

removed from the statutory definition.[10] *Norris v. State Teachers Retirement Sys.* (May 21, 1992), Cuyahoga App. No. 59915, 1992 WL 110210, citing *In re Appeal of Ford* (1982), 3 Ohio App.3d 416, 417–418, 3 OBR 484, 446 N.E.2d 214.

{¶ 46} The question is whether the different agencies, departments, and instrumentalities are all considered to be the state of Ohio for purposes outside of R.C. Chapter 2743. We believe that they are. Regardless of which agency is acting, it is doing so in order to advance or protect the state's interests—whether by providing for the education of its children, by securing retirement funds for its employees and teachers, or by building and maintaining safe public thorough-fares. The state is not a conglomeration of individual actors under a single umbrella entity; it is a single actor playing countless roles in order to exercise its power efficiently. Thus, for the same reason that one agency of the state cannot sue another for money damages in the Court of Claims—a party may not sue itself—the state generally should not be permitted to advance a position on an issue, litigate that issue to final adjudication, and later relitigate the issue under the cloak of a different agency.

{¶ 47} The Supreme Court of Ohio has expressed the same conclusion. In *State v. Williams* (1996), 76 Ohio St.3d 290, 667 N.E.2d 932, the court confronted the "question of whether the doctrine of collateral estoppel precludes relitigating, in the criminal proceeding for a charge of drunk driving, an issue that was previously ruled on at the administrative-license-suspension hearing." Id. at 292, 667 N.E.2d 932. There, the state asserted that it was the Bureau of Motor Vehicles whose interest was served in the suspension hearing and not the state whose interest is represented at a criminal trial. Accordingly, the prosecution argued that issue preclusion did not apply, as there was no mutuality of parties. The *Williams* court disagreed:

> The state acts through its various agencies and entities, and the Bureau of Motor Vehicles is an agency of the state. We conclude that the state of Ohio is the real party in interest in both proceedings and the requirement of privity * * * is satisfied.

Id. at 295, 667 N.E.2d 932.[11]

{¶ 48} In *Williams*, it appears that this state's highest court has already considered our question and answered it in the affirmative. For the purposes of

---

**10.** R.C. 2743.01(A), in its entirety, reads: " 'State' means the state of Ohio, including, but not limited to, the general assembly, the supreme court, the offices of all elected state officers, and all departments, boards, offices, commissions, agencies, institutions, and other instrumentalities of the state of Ohio. 'State' does not include political subdivisions."

**11.** Despite determining that collateral estoppel applied to the case before it, the *Williams* court considered several factors, such as the possible adverse impact on public safety, and

applying collateral estoppel, regardless of which agency or instrumentality is nominally involved, the state is the real party in interest. Here, ODE never disputed the existence of the *Birinyi* case; it merely argued that *Birinyi* was not relevant to the present case because ODE had no part in the *Birinyi* litigation and agreement.[12] Though a casual perusal leads to the assumption that STRS and SERS, not ODE, were the parties to the first suit, and vice versa, R.C. 2743.01(A) and the Supreme Court of Ohio's decision in *Williams* clarify that each is but a different mask of the same party—the state.

{¶ 49} Having established mutuality, the remaining requirements for applying collateral estoppel present little difficulty. There is no question that the identity of CALA's governing authority is a primary issue in appellant's suit against ODE. By the agreement of the parties involved, *Birinyi* conclusively established "AU as the governing authority of CALA." Additionally, because that factual issue was incorporated into the consent judgment entry, it is deemed actually litigated and determined by a court of competent jurisdiction, the Cuyahoga County Court of Common Pleas. *Nye*, at ¶ 14.

{¶ 50} In light of the above, we find that the trial court erred in failing to consider the preclusive effect of *Birinyi*. Although the trial court stated that the "evidentiary basis for such argument was not admitted at trial, and the court therefore does not find the agreement to be persuasive," the record of proceedings shows that appellants did introduce into evidence a copy of the *Birinyi* consent judgment entry, with the attached settlement agreement and release. Appellants' attorney also attempted to question Stuart Berger regarding the previous litigation, but was unable to do so when the court sustained ODE's objection.[13] Additionally, appellants' counsel drew the court's attention to the *Birinyi* case during closing arguments. Moreover, the state does not dispute the evidence of the *Birinyi* judgment, only its relevance.

{¶ 51} We sustain appellant's second assignment of error on the basis of collateral estoppel. If the outcome of this case were dependent only upon the language and construction of the contract, the result would be different. Howev-

---

concluded that a clear and convincing need existed for a new determination of the issue. Thus, the court held that collateral estoppel did not "preclude the relitigation in a criminal proceeding of an issue that was previously determined at an administrative-license-suspension hearing." Id. at 296, 667 N.E.2d 932.

12. Additionally, in its briefing to this court, ODE appears to misconstrue appellants' argument as one for promissory estoppel only and fails to discuss the possible ramifications of applying collateral estoppel.

13. The trial court's grounds for sustaining the objection are not entirely clear. However, the trial transcript reveals one of two reasons: general relevancy or ODE's lack of involvement in *Birinyi*. At any rate, the objection was sustained.

er, the state, through the Ohio Attorney General's representation of STRS and SERS, has already "recognize[d] AU as the governing authority of CALA" during litigation in a court of competent jurisdiction. We must respect the well-established doctrine of collateral estoppel—recognized as important mechanisms for protecting the finality of judgments—and require the state to honor its previously taken position.[14]

{¶ 52} Furthermore, once the trial court deduced that appellants lacked standing to pursue the breach-of-contract claims, there was no reason for it to further investigate the merits of those claims. Hence, appellants' breach-of-contract claims have not yet been meaningfully addressed or determined. It is not the place of this court to decide issues not adjudicated by a court of general jurisdiction. Accordingly, we must decline to address appellants' first assignment of error.

{¶ 53} Appellants' second assignment of error is sustained. Having determined that the state is estopped from denying appellants' standing, we reverse the decision of the trial court and remand this cause to the trial court for determination of appellants' asserted breach of contract claims.

Judgment reversed<br>
and cause remanded.

PETREE, J., concurs.

WHITESIDE, J., concurs in part.

WHITESIDE, J., retired, of the Tenth Appellate District, sitting by assignment.

WHITESIDE, J., concurring in part.

{¶ 54} Although I concur in the sustaining of the second assignment of error on the basis of collateral estoppel, the reversal of the trial court's judgment and the remand for determination of the breach of contract claims, I cannot concur in the discussion in the opinion concerning the "governing authority" of the CALA. Although the Court of Claims found that the "governing authority" is Elijah Scott and David Smith because they are so named in the contract, this is not possible because, as pointed out in the majority opinion, R.C. 3314.03(A)(1) required that "the school shall be established as a nonprofit corporation established under Chapter 1702 of the Revised Code." At the time in question, R.C. Chapter 1702 provided that a nonprofit corporation be governed by a Board of Trustees elected by the member or members of the nonprofit corporation. Thus, the individuals

---

14. Similarly, judicial estoppel also appears to prevent the state from taking a position contrary to that previously asserted.

Elijah Scott and David Smith could not qualify as the governing authority of the school because they are not and cannot be a nonprofit corporation.

{¶ 55} As also indicated in the majority opinion, AU–Special is a corporation not for profit and its three incorporators serve as its board of trustees until the first meeting called to elect trustees. Whether or not that meeting has been held and whether trustees were elected and, if so, the names of the trustees are not apparent. However, AU–Special is the only nonprofit corporation in the record. The relationship between CALA and AU–Special is not clear, but the evidence does indicate that AU–Special operated CALA. Whether or not CALA was a trade or business name (dba) of AU–Special is also not clear. In short, the record is unclear as to the official identity if the "governing authority" of CALA, except that it could not have been the individuals Elijah Scott and David Smith. However, in light of our determination that the state is estopped from denying that the appellants have standing, it is now for the courts to untangle the confusing situation that has been created by the parties.